Territorial Law Library

# IN THE SUPERIOR COURT OF GUAM

MARIA A. GANGE, JESUS CRUZ )
CHARFAUROS, ANA A. CHARGUALAF, )
and JESUS G. AGUIGUI, for themselves and )
on behalf of all others similarly situated, )
                               )
                    Plaintiffs, )

vs. )

GOVERNMENT OF GUAM, GUAM )
ANCESTRAL LANDS COMMISSION, by )
and through its individual Commissioners (for )
injunctive relief only to prevent a transfer) and )
DOES One (1) through Three Hundred (300), )
inclusive, )
                    Defendants. )
_____ )

CIVIL CASE NO. CV1401-10

DECISION AND ORDER

## INTRODUCTION

This matter came before the Honorable Arthur R. Barcinas on the 11th day of February, 2011, for hearing on the Defendants' "Motion to Dismiss," made pursuant to Rule 12(b), subsections (1) and (6) of the Guam Rules of Civil Procedure. Attorney Curtis C. Van de veld represented the Plaintiffs, and Assistant Attorney General William C. Bischoff represented the Defendants. The Court now issues the following Decision and Order on the matter.

## PROCEDURAL HISTORY

In 1952, citing to community and public difficulties such as a housing shortage, limited economic growth, the lack of a fair market, the lack of a functioning judicial system, and "historic injustices" in Guam, the United States Congress authorized the return of approximately thirty thousand (±30,000) acres of land in Guam (hereinafter "Federal Excess Lands"), previously condemned by the United States, to the Government of Guam for administration and redistribution to the public. *See* Public Law 25-45:2(b) and ( c)(1999). In order to fairly

administer these Federal Excess Lands, in 1999, the Guam Legislature and the Governor of Guam passed Public Law 25-45, which created and codified Chapter 80 of Title 21 of the Guam Code Annotated. Public Law 25-45 contained extensive legislative history, research, and findings regarding the public purpose and effect of this legislation.

As part of this law, 21 GCA § 80103 was codified, creating the Guam Ancestral Lands Commission, to implement the administration of the Federal Excess Lands, and return such lands to private ownership wherever possible under 21 GCA § 80104. Further, the law recognized that certain lands could not be returned to private ownership and thus, 21 § 80104(e) created a land trust appointing the Guam Ancestral Lands Commission as trustee of a Guam-based trust for the benefit of those private individuals who could not repossess ancestral lands as beneficiaries, with certain unreturned lands to be held as assets of the "Land Bank" Trust (hereinafter "Land Trust"). This group of beneficiaries consisted of all individuals who could not regain possession of their ancestrally owned lands, herein named the Dispossessed Ancestral Landowner Beneficiaries (hereinafter "DALB").

Titles to those lands which could not be returned due to continued public use were deeded to the Land Trust, and held for the specific benefit of the DALB. Those lands deeded to the Land Trust under Title 21, Chapter 80, on February 18, 2004, included Lot Naval Radio Station ( R) Finegayan-1 (formerly Federal Aviation Administration (FAA) site, also referred to as "Parcel N2," consisting of ±2,758,882 square meters, or ±581.732 acres, hereinafter referred as "Lot Naval Radio Station," and Lot Andersen South, also known as Marbo Base Command "C," or Andersen South, consisting of approximately ±1,598,877 square meters, or ±395.09 acres of land, hereinafter "Lot Andersen South." Decl. of Curtis C. Van de veld, Instrument Number 638615,

Grant Deed, Assignment and Trust Agreement Between Guam Ancestral Lands Commission (Grantor, Assignor) and Guam Ancestral Lands Trust Subcommittee aka Guam Ancestral Land Commission's "Land Bank" (Trustee) (filed August 25, 2010). These lots comprise two of the largest assets of the Land Trust, and in 2010, the Land Trust was actively engaged in procurement aimed at leasing these lots to generate income for the benefit of the DALB. Id., Letter of Mr. Richard E. Jortberg Re: RFP 07-003.

However, on July 13, 2010, the Acting Governor of Guam signed into law Public Law 30-158, requiring the direct transfer of these two parcels of land from the Land Trust to certain specified individuals, consisting of a smaller group of 37 selected individual recipients who had previously been members of the DALB. Under Public Law 30-158, these 37 individually named recipients (hereinafter "selected individuals") would receive title to plots of land parceled out of Lot Andersen South and Lot Naval Radio Station. Section 2 of Public Law 30-158 specifically identified Lot Andersen South and Lot Naval Radio Station as the two parcels of real property which would be transferred from the Land Trust to the selected individuals, stating:

> Pursuant to Public Law 30-06, the following parcels of unregistered and unsurveyed properties are hereby identified as delineated in the report by the Task Force, and attached hereto as "Exhibit A," as properties available for the land exchange: Lot Naval Radio Station (R) Finegayan-1 (formerly Federal Aviation Administration (FAA) Site), also referred to as "Parcel N2", consisting of ± 2,758,882 square meters, or ± 581.732 acres; and Andersen South, also known as Marbo Base Command "C" or Andersen South, consisting of approximately ± 1,598,877 square meters, or ± 395.09 acres of land.

Public Law 30-158, § 2, lines 7–13 (July 13, 2010).

Under this law, no compensation was provided for the governmental transfer of these two lots from the Land Trust, held for the benefit of the DALB, to the 37 selected individuals.

## DISCUSSION

The Plaintiffs (the former DALB, excepting the 37 selected individuals) have applied for the issuance of both a Temporary Restraining Order and a Preliminary Injunction to prevent the removal of these lands as assets from the Land Trust and to prevent the transfer of title of these trust assets to the selected individuals. Temporary Restraining Orders are governed by Rule 65(b) of the Guam Rules of Civil Procedure, and Preliminary Injunctions are governed by Rule 65(a) of the same rules. These types of injunctions are further circumscribed by CVR Rule 65.1(a) and (b) of the Local Rules of the Superior Court of Guam. On September 8, 2010, on the Plaintiffs' separate application requesting a TRO, as required by CVR Rule 65.1(a)(1), the Court issued a Temporary Restraining Order (hereinafter "TRO"). The same day, the Defendants filed a "Motion to Dismiss" citing to "Guam Rules of Civil Procedure 12(b)(1) and (6)" and requesting "to dismiss plaintiffs' complaint." Gange et. al. v. Government of Guam et. al., Civil Case No. CV1461-10, Defs.' Mot. to Dismiss, p.1, lines 24–5 (filed September 8, 2010).

Although framed in the context of Rule 12(b), this "motion to dismiss" does not actually challenge the sufficiency of any of the allegations of the Plaintiffs' Complaint, as would be the usual course of procedure under GRCP Rule 12(b). Instead, the Defendants' Motion to Dismiss argues that "as a matter of law" the Plaintiffs have no property interest created by 21 GCA § 80104(e), and therefore, there is no taking which can be compensated. The Defendants further argue, as a matter of law, that the Plaintiffs have no right to request injunctive relief "in this kind of an action." Id., Defs.' Mot. to Dismiss, p.7, lines 19–22, and p. 5, lines 19–20 (filed September 8, 2010). Oddly, the Defendants' Motion to Dismiss seems to ignore the Plaintiffs' lack of specificity in defining "this kind of an action," and instead focuses on the merits of a grant of

injunctive relief after the Court's issuance of a TRO. Defendants' arguments do not actually challenge the contentions within Plaintiffs' Complaint, rather, the Defendants' arguments are directed against the issuance of an injunction.

The Fifth Circuit Court of Appeals, in the case of Ross v. Evans, 325 F.2d 160 (5th Cir. 1963), found that where a party filed a "motion to dismiss the complaint" after the court's grant of a TRO in an action for injunctive relief, such motion was inconsistent with the procedure by which to contest a TRO. Stating, "[o]n January 21, 1963, the District Director filed a motion to dismiss the complaint. The District Director did not, by this motion or at any other time or in any other manner seek to dissolve the temporary restraining order," the Court found that a motion to dismiss is not the equivalent of a proper motion to dissolve a TRO, and suggested that the contesting party would have been better served by simply filing a motion to dissolve the order as set forth in Rule 65(b). Id. at 160.

In this case, the Defendants have similarly filed and repeatedly insisted upon a hearing on their "Motion to Dismiss." Because of the Defendants' immediate filing and insistence that the motion to dismiss be heard, in the resulting disorder, the Court set a hearing for this motion, rather than a preliminary injunction hearing, and the Plaintiffs never appropriately requested an order to show cause under CVR Rule 65.1(b) as required to set a preliminary injunction in place. The Defendants challenge the issuance of injunctive relief, but have filed a Motion to Dismiss, thus muddling the injunctive processes set forth under Rule 65 and CVR Rule 65.1, confusing both the Plaintiffs and the Court, and irretrievably delaying the resolution of this case.

The issuance of injunctive relief, particularly regarding the initial TRO and preliminary injunction proceedings, is intended to be expedited and perfunctory, in order to preserve the

"status quo" between parties until a final adjudication of the merits of a case. Sierra On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1422 (9th Cir. 1984); and CVR Rule 65.1(b). The Second Circuit Court of Appeals, in finding that the proper method of procedure was to determine the issuance of preliminary injunctive relief prior to determining dismissal of the case, reasoned:

> [A] preliminary injunction- as indicated by the numerous more or less synonymous adjectives used to label it- is, by its very nature, interlocutory, tentative, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive, characterized by its for-the-time-beingness. It serves as an equitable policing measure to prevent the parties from harming one another during the litigation; to keep the parties, while the suit goes on, as far as possible in the respective positions they occupied when the suit began. For the foregoing reasons, we cannot hold that the judge should have dismissed the complaint on the merits.

Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 742 (2d Cir. 1953).

Again, in distinguishing a preliminary injunction proceeding from other civil procedures, the Ninth Circuit Court of Appeals tellingly found that the requirement of a particular form of evidence or manner of presentation of argument at a preliminary injunction hearing "would in effect require a full hearing on the merits and would thus defeat one of the purposes of a preliminary injunction which is to give speedy relief from irreparable injury. Where the injunction is granted, the enjoined party is protected by the requirement that the petitioner post a bond and by the requirement that the court support its discretionary action with findings of fact and conclusions of law." Ross-Whitney Corp. v. Smith-Kline & French Laboratories, 207 F.2d 190, 198 (9th Cir. 1953). Due to the exigency of the proceedings, there is no requirement as to the form or manner of the presentation of the arguments or evidence to determine whether a preliminary injunction should issue. As stated by the District Court of California, "Rule 65, to the extent applicable here, merely requires that notice be given and hearing be had, both of which

were satisfied in the proceedings in the court." Kennedy for and on Behalf of N. L. R. B. v. Sheet Metal Workers, 289 F.Supp. 65, 90 (Dist. Ct. Cal. 1968).

As indicated in Ross, Hamilton Watch Co., and other aforementioned cases, other rules of civil procedure regarding specified motions on the merits, including Rule 12, should not be intermingled with the special and expedited process which is explicitly provided for injunctive relief under Rule 65. Ross, 325 F. 2d at 160. Rule 65(b) provides the party opposing injunctive relief with a specific mechanism for opposition; if the TRO is granted, and on at least two days notice to the party who obtained the TRO, the adverse party may appear and seek the dissolution or modification of the TRO. GRCP Rule 65(b) (2011); and Ross, 325 F.2d at 160. A motion to dismiss is simply an inappropriate procedural vehicle to challenge this particular process, prior to the grant of a preliminary injunction.

The United States Supreme Court has supported this finding, and has further found that when the parties have been afforded notice and a full hearing at which both parties have been allowed to present all arguments in support and opposition to the grant of injunctive relief, the hearing on the motion opposing the injunction may properly be considered as a preliminary injunction hearing under Rule 65(a), holding:

> Rule 65(b) establishes a procedure whereby the party against whom a temporary restraining order has issued can move to dissolve or modify the injunction, upon short notice to the party who obtained the order. *Situations may arise where the parties, at the time of the hearing on the motion to dissolve the restraining order, find themselves in a position to present their evidence and legal arguments for or against a preliminary injunction. In such circumstances, of course, the court can proceed with the hearing as if it were a hearing on an application for a preliminary injunction.* At such hearing, as in any other hearing in which a preliminary injunction is sought, the party seeking the injunction would bear the burden of demonstrating the various factors justifying preliminary injunctive relief, such as the likelihood of irreparable injury to it if an injunction is denied

and its likelihood of success on the merits.

Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers, 415 U.S. 423, 441 (1974) (emphasis added).

In this case, because the Defendants filed a "Motion to Dismiss," in order to oppose the grant of injunctive relief, rather than a motion to dissolve the restraining order, the Plaintiffs, in response, and in support of their own request for injunctive relief, failed to file a separate request for an order to show cause within ten days of the issuance of the TRO under CVR Rule 65.1(b). Both parties have procedurally mishandled this case. However, the overriding principle of the Rules of Civil Procedure is to ignore insubstantial errors when they do not prejudice the other party or affect the substantive power of the court to issue a decision. Foman v. Davis, 371 U.S. 178, 181–2 (1962). Thus, in accordance with the guidance provided by the United States Supreme Court in Granny Goose, this Court will attempt to determine the injunctive issues presented in the most efficient and practical manner. The conversion of a hearing into a preliminary injunction hearing, when notice and hearing on the issue has occurred, is especially appropriate when viewed in the context of the mandate of Rule 65(b), that "a preliminary injunction shall be set down for hearing at the earliest possible time and takes precedence of all matters except older matters of the same character; . . ." GRCP Rule 65(b).

Accordingly, although the Defendants have importuned their arguments opposing the grant of injunctive relief within a "Motion to Dismiss," and the Plaintiffs have failed to make a separate motion for the issuance of either a TRO or a preliminary injunction, as set forth under CVR Rules 65.1(a) and (b), the Court will address the merits and content of their arguments within the appropriate procedural context of GRCP Rule 65(a). In the instant case, the Plaintiffs have

brought suit requesting the remedy of injunctive relief. A TRO has already been granted pursuant to Rule 65(b), and the Plaintiffs have further requested a preliminary injunction in their application. Both the Plaintiffs and the Defendants were not only afforded the opportunity to be heard on the merits of whether a preliminary injunction should issue, but both parties actually presented their arguments for and against the grant of injunctive relief. Notably, the Plaintiffs labeled their opposition brief as both an "Opposition to Motion to Dismiss" and as a "Reply to Opposition to Ex Parte Application for a Restraining Order and for a Preliminary Injunction," further indicating that the substance of the likelihood of success on the application for injunctive relief was at issue, and was being controverted by the Plaintiffs and the Defendants at the time of the hearing on February 11, 2011. Gange et. al. v. Government of Guam et. al., Civil Case No. CV1461-10, Pls.' Reply to Opposition to Ex Parte Application for a Restraining Order and for a Preliminary Injunction and Opposition to Motion to Dismiss (filed October 29, 2010).

As both parties received ample notice and a full hearing, at which both sides presented argument and evidence concerning whether the Plaintiffs were likely to succeed on the merits of the underlying application, satisfying the requirements of Rule 65(a), the Court will consider the merits of the issuance of a preliminary injunction. Granny Goose Foods, Inc., 415 U.S. at 441; see also Amoco Production Co. v. Village of Gambell, Alaska, 480 U.S. 531, 546 n. 12 (1987) (Standard for issuance of preliminary injunction is "likelihood" of success on the merits, and is thus slightly differed from the standard for a permanent injunction, or a TRO). In order for the court to grant a preliminary injunction, the Plaintiffs must show both irreparable injury and likelihood of success on the merits. Hongkong and Shanghai Banking Corp., Ltd., v. Kallingal, 2005 Guam 13 ¶ 18; and Granny Goose Foods, Inc., 415 U.S. at 441. Because there are no

formal requirements on a hearing for a preliminary injunction other than notice and an opportunity to be heard, and the parties received notice and fully disputed the issue of whether the Plaintiffs were likely to succeed in this matter, the hearing of February 11, 2011, was, for all intents and purposes, a preliminary injunction hearing. GRCP Rule 65(a) and Granny Goose Foods, Inc., 415 U.S. at 441.

In their "Motion to Dismiss" the Defendants argue that the Plaintiffs cannot prevail in this matter because: 1) Public Law 30-158 does not effect a taking from the Plaintiffs, nor has such taking yet occurred; and 2) even if Public Law 30-158 effects a taking, the Plaintiffs may seek relief in the form of payment after the taking, through inverse condemnation proceedings under 7 GCA § 11311.1, thus they may not pursue equitable relief. In essence, the Defendants argue that the Plaintiffs cannot prove an irreparable injury, as Public Law 30-158 does not effect a taking from them, and that the Plaintiffs cannot show a likelihood of success on the merits, as injunctive relief is not available in a case involving an alleged taking. The Court will analyze these assertions in turn.

## 1) Does Public Law 30-158 Effect a Taking?

Under the Fifth Amendment takings may be of real and personal property. Personal property is considered taken where "the owner is deprived of its use . . .as the natural consequence of the deliberate, intended exercise of an asserted power" of the government. Causby v. United States, 75 F.Supp. 262, 264 (Ct. Cl. 1948); see also Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1004–05, 1010–13 (1984); Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 164 (1980); Kimball Laundry Co. v. United States, 338 U.S. 1, 3, 14, 16 (1949); Todd v. United States, 292 F.2d 841, 845-846 (Ct Cl.1961); and Seery v. United States, 161 F.Supp. 395, 399 (Ct.

Cl. 1958). In order to state a claim under the Takings Clause, a plaintiff must first demonstrate that he or she possesses a "property interest" that is constitutionally protected. *See* Monsanto, 467 U.S. 986, 1000-01 (1984); and Penn Central Transportation Co. v. New York City, 438 U.S. 104, 125 (1978).

In resolving the Plaintiffs' claims, the first issue is whether the Plaintiffs have been deprived of a property interest by Public law 30-158. "'Property interests ... are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" Webb's Fabulous Pharmacies, 449 U.S. at 161 (1980) (quoting Board of Regents v. Roth, 408 U.S. 564, 577 (1972)); Monsanto, 467 U.S. 986, 1001 (1984); and Thomas v. Cohen, 304 F.3d 563, 576 (6th Cir.2002); *accord* United States ex rel. T.V.A. v. Powelson, 319 U.S. 266, 279 (1943)("[t]hough the meaning of 'property' as used in Sec. 25 of the Act and in the Fifth Amendment is a federal question, it will normally obtain its content by reference to local law.").

In noting that the United States Supreme Court has often struggled with defining "the 'property interest' against which the loss of value is to be measured," the court suggested:

> The answer to this difficult question may lie in how the owner's reasonable expectations have been shaped by the State's law of property— i.e., whether and to what degree the State's law has accorded legal recognition and protection to the particular interest in land with respect to which the takings claimant alleges a diminution in (or elimination of) value.

Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1016 (1992).

Despite the acknowledged importance of state law recognition, some property interests, such as interest income, have been deemed so basic and fundamental as to be intrinsically recognized by the constitution, even in the absence of state legislation declaring such interests as

private property, and more importantly, despite the existence of legislation declaring such interest to be public. Webb's, 449 U.S. at 156–65; Phillips v. Washington Legal Foundation, 524 U.S. 156, 160–65 (1998); and Schneider v. California Dept. of Corrections, 151 F.3d 1194, 1196–1200 (9th Cir. 1998).

Section 3 of Public Law 30-158 effects the alleged taking from the Land Trust:

> Within one hundred eighty (180) days after the enactment of 16 this Act, all original landowners of properties transferred to the A. B. Won Pat International Airport Authority (GIAA) by the United States of America, but whose properties were retained by GIAA shall be deeded by the Guam Ancestral Lands Commission (GALC) and I Maga'lahen Guahan (the Governor of Guam), from the real properties identified in Section 2 of this Act, their proportionate share of property retained and not returned to them by GIAA based on a value for value or size for size basis at the discretion of the GALC.

Public Law 30-158, § 3, lines 15–21.

Even if the Court did not particularly define the interest taken by Public Law 30-158, it appears that the conclusion that Public Law 30-158 effects the taking of an interest subject to the Takings Clause, by removing lands from the Land Trust, is unavoidable:

> We need not define the precise nature of the Fideicomiso's interests in these lands to hold that they are sufficient to establish an injury in fact if Law 32 is enforced. Law 32 is directed explicitly at the Fideicomiso and creates an injury in fact by its very terms, which state that any Commonwealth and municipal lands transferred to the Fideicomiso will immediately return to it.

Fideicomiso De La Tierra Del Cano Martin Pena v. Fortuno, 604 F.3d 7, 16 (1st Cir. 2010).

However, it appears to the Court that Public Law 30-158 effects a taking of particular personal property, interest income, through the removal of real property from the Land Trust corpus. Guam law specifically defines property terms, distinguishing between real and personal property when necessary through the use of terms of art. 1 GCA § 715 specifically states:

> The following words have in this Code the meaning attached to them in this Section, unless otherwise specifically provided or apparent from the context: 1. The word property includes both real and personal property; 2. The words real property are coextensive with lands, tenements and hereditaments; 3. The words personal property include money, goods, chattels, things in action, and evidence of debt; . . .

1 GCA § 715 (2011).

Thus, under Guam law, whenever the term "property" is used in a statute, without a modifying description, both realty and personalty are included. However, whenever a statute specifically uses the term "real property," only realty is connoted, and whenever the term "personal property" is used, only personalty is implicated.

Through 1 GCA § 1421(b)(u), Guam has specifically adopted the language of the Fifth Amendment, which states, as codified, "nor shall *private property* be taken for public use, without just compensation." 1 GCA § 1421(b)(u)(adopting U.S. Const. amend. V)(emphasis added). The law, as adopted in Guam, does not use a modifier, nor does the language distinguish between real and personal property, as set forth under 1 GCA § 715. Thus, under this statute and a plain language interpretation, in Guam, takings may be of real or personal property.

Personal property in Guam consists of money, and other related things of monetary value, which includes interest or earnings. 1 GCA § 715. Although the courts of Guam have not yet addressed this issue, in the takings context, the United States Supreme Court has recognized that a taking of trust assets or income constitutes a taking of a long-standing traditional property right for which the government must provide compensation under the Fifth Amendment.

In Webb's, the United States Supreme Court addressed whether the state of Florida had effected a taking of private property through the legislative enactment of a statute providing that

interest accruing on an interpleader fund deposited in the registry of the court " 'shall be deemed income of the office of the clerk of the circuit court.' " Webb's, 449 U.S. at 156 (1980)(quoting Fla. Stat. § 28.33 (1977))(emphasis deleted). In that case, the appellant deposited nearly $2 million into the court's fund to be distributed to creditors upon judgment. Id. In total, the clerk of court retained more than $100,000 in interest income generated by the deposited funds prior to the issuance of judgment. Id. The United States Supreme Court held that the statute authorizing the clerk to confiscate the earned income violated the Takings Clause. The unanimous court explained:

> . . . a State, by *ipse dixit*, may not transform private property into public property without compensation, even for the limited duration of the deposit in court. This is the very kind of thing that the Taking Clause of the Fifth Amendment was meant to prevent. That Clause stands as a shield against the arbitrary use of governmental power.

Id. at 164.

The court held that a state may not circumvent the Takings Clause simply by passing new legislation that disregards and abrogates traditional property interests long recognized under common law or state law. Id. at 163-164; *see also* Lucas, 505 U.S. 1003, 1029 (1992).

The nation's highest court particularly took issue with the state's characterization of the income as "public money" by virtue of the fact that the funds were held and managed by the government, and thereby produced income. Webb's, 449 U.S. at 161–64 (1980). "It was property held only for the ultimate benefit of Webb's creditors, not for the benefit of the court and not for the benefit of the county. And it was held only for the purpose of making a fair distribution among those creditors." Id. at 161. Ultimately, the court declared:

> Neither the Florida Legislature by statute, nor the Florida courts by judicial decree,

may accomplish the result the county seeks simply by recharacterizing the principal as "public money" because it is held temporarily by the court. The earnings of a fund are incidents of ownership of the fund itself and are property just as the fund itself is property.

Id. at 164.

Of particular note, the Webb's court acknowledged that Webb's creditors did not have a right to the assets of the fund at the time the income was accrued, but found the absence of concurrent ownership rights to the underlying assets to be of no consequence, stating: "[the] lack of immediate right, however, does not automatically bar a claimant ultimately determined to be entitled to all or a share of the fund from claiming a proper share of the interest, the fruit of the fund's use, that is realized in the interim." Id. at 162.

In Phillips v. Washington Legal Foundation, 524 U.S. 156 (1998), the Supreme Court revisited the issue, and affirmed that income earned on a fund held in trust constitutes property which is subject to the Takings Clause. "The question presented by this case is whether interest earned on client funds held in IOLTA accounts is "private property" of either the client or the attorney for purposes of the Takings Clause of the Fifth Amendment. We hold that it is the property of the client." Phillips, 524 U.S. at 160. Again, the United States Supreme Court entirely disavowed the notion that "private property" was not implicated because the funds and the income thereon became "public" by the government's retention and management of these funds. The court re-emphasized: "we rejected a similar 'government-created value' argument in Webb's. . . .explaining that 'the State's having mandated the accrual of interest does not mean the State or its designate is entitled to assume ownership of the interest.'" Id. at 171 (quoting Webb's, 449 U.S. at 162).

In <u>Brown v. Legal Foundation of Washington</u>, 538 U.S. 216 (2003), the United States Supreme Court once again affirmed its previous rulings that interest income earned on a trust account constitutes a compensable property interest subject to the Takings Clause. <u>Id</u>. at 235.

Under the holdings in this line of cases, it is apparent that mere governmental management or administration of a fund cannot transform a private trust into a public trust.

The Defendants argue that Public Law 30-158 does not effect taking because the law merely transfers property from the Government of Guam to private individuals, rather than taking property from private individuals for transfer to other private individuals. Although the Defendants acknowledge that Public Law 30-158 removes Lot Andersen South and Lot Naval Radio Station from a trust, they argue that the Land Trust is administered by the Government of Guam, and further, that the Land Trust, the commission members of which are appointed by the government, owns title to the assets within the trust. On these facts, Defendants argue that the governmental administration over the Land Trust's ownership of the assets converts the trust into a public trust, which is merely a part of the Government of Guam, and thus, no taking is effected by Public Law 30-158.

21 GCA § 80103 creates the Guam Ancestral Lands Commission, stating, "[t]here is within the government of Guam the Guam Ancestral Lands Commission to carry out the purposes of this Chapter." 21 GCA § 80103 (2011). It appears undisputed that the Guam Ancestral Lands Commission is an instrumentality of the Government of Guam under this statute. However, the Guam Ancestral Lands Commission does not hold title to the real property. Instead, the Land Trust, a subcommittee appointed by the Guam Ancestral Lands Commission, holds these titles. Pursuant to 21 GCA § 80104(e), the Guam Ancestral Lands Commission was required to

establish the Land Trust as the fiduciary of the trust in order to administer land assets to provide income and benefit to the DALB:

> Land Bank. *The Commission shall take title, as Trustees,* of former Spanish Crown Lands and other non-ancestral lands that are conveyed by the Federal government to the government of Guam after the effective date of this Act, *on behalf of ancestral landowners who, by virtue of continued government or public benefit use cannot regain possession or title to their ancestral lands.*
> The Commission shall establish a *Guam-based trust* to administer *all assets and revenues of the land bank of the aforementioned lands* and manage the lands, and act as the developer of the lands, if necessary, to the highest and best use. The Commission shall establish rules and regulations pursuant to the Administration Adjudication Law for the Guam-based trust. *The resulting income shall be used to provide just compensation for those dispossessed ancestral landowners.*

21 GCA § 80104(e)(2011)(emphases added).

The Land Trust was established and title to Lot Andersen South and Lot Naval Radio Station were transferred to the Land Trust under Instrument Number 638615. Further, the trust is instituted not only by statute, but is evidenced by a contract and deed as well. Instrument Number 638615, Grant Deed, Assignment and Trust Agreement Between Guam Ancestral Lands Commission (Grantor, Assignor) and Guam Ancestral Lands Trust Subcommittee aka Guam Ancestral Land Commission's "Land Bank" (Trustee) (hereinafter "Trust Agreement") imposes fiduciary duties and obligations on the Land Trust in holding Lot Andersen South and Lot Naval Radio Station. Regarding the release of the rights to ownership and use of the properties, it states in section 1:

> Trust Agreement made this 18[th] day of February.(sic) 2004, between *the Guam Ancestral Lands Commission (GALC), Government of Guam, hereinafter called the Grantor, Assignor,* and the Guam Ancestral Lands Trust Subcommittee, which shall also be known as The Guam Ancestral Land Commission's "Land Bank" for popular usage, hereinafter called the Trustee. 1. TRUST PROPERTY. The Grantor hereby assigns and delivers to the Trustee in trust, the real property listed herein as follows: A. Portion of Andersen South, that certain real property situated

in Guam, the Municipality of Yigo and Mangilao, consisting of approximately 1,598,877 square meters, or 395.09 acres of land, also known as Marbo Base Command "C" or Andersen South, more particularly described in Exhibit A of document No. 623933. The portion is subject to survey to determine the size and boundaries. . . . J. Portion of Lot Naval Radio Station (R) Finegayan-1 (formerly Federal Aviation Administration (FAA) Site), also referred to as "Parcel N2,(sic) consisting of an area of 29,696,235 square feet or 2,758,882 square meters, or 681.732 acres, more or less, as described in Exhibit A of Instrument No. 636649, and as shown on Document Number 624411, recorded in the Department of Land Management of the Government of Guam, comprising of NAVFAC Drawing Numbers 7942872 and 7942873. The portion is subject to survey to determine the size and boundaries. . . .*This property and all the Grantor's rights and privileges thereto*, receipt of which is hereby acknowledged by the Trustee, *to be held in trust for the uses and purposes hereinafter expressed and subject to the conditions of the trust hereinafter provided.*

Decl. of Curtis Van de veld, Esq., Exhibit 1, Grant Deed, Assignment, and Trust Agreement, pp. 1–3, Section 1 (filed August 25, 2010)(emphases added)(hereinafter referred to as "Deed and Trust Agreement").

Through the specific language of the statute, 21 GCA § 80104(e), it is undisputed that the Land Trust is administered indirectly by the Government of Guam. However, under the Deed and Trust Agreement, it is clarified that the Government of Guam has divested itself, as the Grantor, of "all rights and privileges" to the real properties as assets of the trust and instead, the assets of the trust are held by the instrumentality of the Land Trust. In creating the trust, the Deed and Trust Agreement expressly adopted the protections of the Just Compensation Clause of the Fifth Amendment within its provisions. Pursuant to its terms, the Government of Guam has no authority to remove any assets or income of the trust without providing the trust adequate repayment or consideration for such removal:

No powers enumerated herein or accorded to trustees generally by law shall be construed to enable Grantor, Trustee, or otherwise, or any other person to purchase, exchange, or otherwise deal with the corpus or income of this trust,

directly or indirectly without adequate interest or security. *No person other than the Trustee shall have or exercise the power to . . . reacquire or exchange any property of this trust by substituting other property of equivalent value.*

Id. at Section 4 (emphasis added).

It is also undisputed that under Public Law 25-45, the assets of the Land Trust are held for the benefit of specific individuals, the DALB, and not the public in general. The language of the Deed and Trust Agreement reiterates and re-emphasizes that the trust's sole purpose is to generate income for the benefit of the DALB beneficiaries[1], stating:

> The Trustee under this declaration of trust, shall hold, manage, invest, and reinvest the trust property, and shall collect and receive the income there from . . . In the administration of this trust, the Trustees shall have the following powers, all of which shall be exercised only in a fiduciary capacity, primarily in the interest of the beneficiaries: (a) To hold and continue to hold as an investment the property received hereunder. . . to be for the best interest of the trust and the beneficiaries hereunder . . . .(b) To rent or lease any property of the trust . . . for the best interest of the trust and the beneficiaries hereunder. . . .

Id. at p. 4, Section 3.

The trust was created for the sole purpose of providing income to the DALB on the basis that title to the actual assets of the Land Trust could not be given as recompense to the DALB due to continued public use. 21 GCA § 80104(e). The question thus presented is whether the governmental administration of a trust, the assets of which are owned by the trust, but held exclusively for the benefit of private individuals, converts the income earned from the trust into "public money," depriving the trust of its private character and purpose such that the government may dispose of the trust assets and the income earned thereon without violating the Takings

---

[1] The Court will not address issues related to the validity of the trust, as these issues have been neither raised nor argued as part of this preliminary determination.

Clause.

The Defendants rely on the case A.B.A.T.E. of Illinois, Inc. v. Giannoulias, 929 N.E.2d 1188 (Ill.App. 4 Dist. 2010), for the proposition that governmental administration of a trust may preclude application of the general principle that trust income is a private property interest subject to the Takings Clause. In A.B.A.T.E., the monies collected and placed into the CRST Fund as the "trust" corpus were fees charged by the State for the privilege of operating a motorcycle.

For the purpose of making its determination, the A.B.A.T.E. court assumed that the following arguments were true:

> (1) the plain language of the Act shows the legislature created a trust and placed it outside the State Treasury with the intent that no General Revenue Funds could be placed in the trust, (2) the December 1992 amendments show the legislature intended to change the CRST Fund from a special fund inside the State Treasury to a trust fund outside the State Treasury and to deprive the legislature of the power to transfer funds from the CRST Fund into the General Revenue Funds, and (3) the legislative history, including the Governor's veto message and legislative debates, shows the legislature intended to place the CRST funds beyond the power of later legislatures to sweep.

Id. at 1194.

Despite acceptance of these arguments, the A.B.A.T.E. court found that the transfer of CRST funds into the General Revenue Fund did not constitute a compensable taking under the Takings Clause. The court offered two essential reasons for its decision: (1) a legislature does not have the power to bind future legislatures' constitutional powers to make appropriations of future cash funds by creating irrevocable trusts out of the cash funds; and (2) the legislature which created the "trust" did not include language which explicitly exempted the "trust" from future transfers by future legislatures. Id. at 1195–96.

For its first point, the A.B.A.T.E. court relied on the reasoning set forth by the Colorado

Supreme Court in Barber v. Ritter, 196 P.3d 238 (Colo.2008), quoting:

> None of the statutes creating the funds explicitly reserve to the General Assembly the power as settlor to revoke or amend them. However, we have repeatedly recognized that the General Assembly's power over *appropriations* is constitutionally derived and have characterized this power as 'absolute' and 'plenary.' [Citation.] * * * To hold that the General Assembly could limit this plenary power to appropriate by creating an irrevocable public trust would be to effectively hold that the General Assembly could abrogate its constitutional powers by statute. This is not the law. * * * *We therefore decline to read the cash funds' enabling legislation as creating irrevocable trusts* that would unconstitutionally restrain the legislature's plenary power over *appropriations.*

A.B.A.T.E., at 1195 (quoting Barber, 196 P.3d at 253–54 (emphases added).

The A.B.A.T.E. court found that "'[t]he legislature is . . .the sole and exclusive authority for the appropriation of the funds of the state.' Thus, we hold that, even if the *cash funds* are public trusts, they are not irrevocable trusts, and the legislature has the authority to amend them to allow for the transfer of monies to the General Fund." Id. at 1196 (quoting Galpin v. City of Chicago, 159 Ill.App. 135, 153 (1910); and citing Barber, 196 P.3d at 253–54) (emphasis added).

The A.B.A.T.E. court concluded that the legislature's constitutional power to direct appropriations coupled with its failure to expressly prohibit future transfers of the CRST funds by the legislature showed that the CRST fund was not a private trust fund which could not thereafter be accessed: "if the legislature had intended to exempt the CRST Fund from these transfers, the legislature could have done so explicitly as it did with restricted federal funds, the Motor Fuel Tax Fund, the Criminal Justice Information Systems Trust Fund, and other funds listed. Id. at 1196–97 (citing Pub. Act 93–32, § 50–5, eff. June 20, 2003 (2003 Ill. Legis. Serv. 400, 401–02 (West)); Pub. Act 93–839, § 10–100, eff. July 30, 2004 (2004 Ill. Legis. Serv. 1381, 1402–04 (West)).

The facts of the case *sub judice* are unique. The Plaintiffs argue that the Defendants have effected a taking of their personal property, consisting of income earned on a trust, by taking the underlying assets of the trust. In this case, none of the assets of the Land Trust were derived from governmentally charged and originated fees. In fact, the assets of the trust consist of real property, not appropriations or cash funds, therefore, the legislature's power to appropriate funds is not implicated in this case. The A.B.A.T.E. case is further distinguished in that the real property transfer from the Government of Guam to the Land Trust was a single transaction, whereas the generation of CRST funds was a continual fee collecting process providing the government with a stream of cash assets, which thus, would be subject to future appropriations legislation. More significantly, the statute creating the Land Trust explicitly and expressly creates a private interest and expectation on the part of the DALB, by separating out the assets placed in the Land Trust, in order to generate compensatory income for the DALB, and affirmatively divesting the Government of Guam of any further interest or control over those assets, unlike the enacting legislation in the A.B.A.T.E. case.

Accordingly, the Court finds that the A.B.A.T.E. case is factually dissimilar, and the Plaintiffs' situation is most analogous to the facts presented in Illinois Clean Energy Community Foundation v. Filan, 392 F.3d 934 (7th Cir.2004) regarding the taking of trust assets managed by governmental appointees, and Tellis v. Godinez, 5 F.3d 1314 (9th Cir.1993), regarding trust income.

In Illinois Clean Energy, the Seventh Circuit Court of Appeals held that a trust fund foundation created by statute, and administered by governmental appointees was not a public trust and therefore, the trustees could bring a Takings Clause claim against the state, when it attempted

to appropriate the assets of the fund for state purposes. Id. at 936-37.

Factually, in Illinois Clean Energy, the state legislature "authorized" a private company to establish a charitable foundation, organized under the state's charitable foundation statute, and fund it with $225 million of the proceeds from the sale of its power plants. Id. at 935 (citing to 220 ILCS 5/16-111.1). "The foundation's mission, as prescribed by the statute, is to make grants to public and private institutions in Illinois for projects to conserve energy and improve the environment." Id. The authorizing statute required the appointment of six voting trustees:

> One is to be appointed by ComEd, one by the Governor of Illinois, another by the Speaker of the Illinois House of Representatives, another by the President of the Illinois Senate, and the remaining two by the minority leaders of the two houses. The statute contains no provision for the removal of trustees against their will (if they quit, their successors are appointed in the same manner as they were), but the foundation has adopted a bylaw authorizing the officials who appoint trustees to remove them.

Id. at 936.

After the trust was founded, the Illinois legislature passed legislation "to require the trustees, upon written demand by the state's budget director (the defendant, sued in his official capacity), to turn over to the state's treasury and state environmental agencies up to $125 million, which is to be used for funding the agencies and repaying state general obligation bonds." Id. A demand for the entire $125 million was immediately made, and thereupon the trustees, in their fiduciary capacities, brought a takings claim on behalf of the trust.

In defense of its legislation, "[t]he state argue[d] that the foundation is the state and therefore cannot sue the state and, even if it could, may not complain about a taking of its property because its property is the state's property." Id. In maintaining this argument, the state asserted that the legislative creation of the trust, and the appointment of five of the six trustees by state

officials, logically led to the conclusion that the foundation is an instrumentality of the state, holding state funds in trust. It further argued that a state has an absolute right to pass legislation amending its former legislation.

The Seventh Circuit Court of Appeals soundly rejected these contentions.

> The fact that the state legislature authorized the creation of the plaintiff foundation does not make the foundation a state agency; for the legislature also authorizes the creation of business and professional corporations, not to mention religious and charitable corporations, without thereby acquiring a right to confiscate such entities' assets.

Id. at 936–37 (citing Trustees of Dartmouth College v. Woodward, 4 Wheat. 518, 17 U.S. 518, 638-40, 4 L.Ed. 629 (1819); Northrip v. Federal National Mortgage Ass'n, 527 F.2d 23, 30-31 (6th Cir.1975)).

In particular, the Seventh Circuit questioned the rationality of the state's argument that where a state creates a monetary benefit for any particular party, it may later reclaim such benefit as state funds, merely because the benefit was created by the state:

> Supposing the state could indeed have forced ComEd to disgorge $125 million of its profits from the sale of the power plants, or indeed much more, to the ratepayers, could it then, years later, have ordered the ratepayers to contribute their rebates to the state treasury, on the ground that it was really the state's money? We cannot see what difference it makes that the disgorgement was to a foundation rather than to individuals.

Id. at 937.

The court found that despite the governmental creation of the trust, trust principles should be applied in order to avoid absurdity. Therefore, the Seventh Circuit affirmed the lower court's application of those principles, and "conclude[d] that the State of Illinois would be violating the Constitution if it confiscated any part of the foundation's assets." Id.

In Tellis, the Ninth Circuit Court of Appeals found that an inmate who alleged that the prison had violated the Takings Clause by withholding interest earned on funds in his personal prison bank account, held in trust for him by the state, had asserted standing sufficient to support a takings claim. Id. at 1317. The court found that a Nevada statute which provided, "[t]he interest and income earned on the money in the [prisoner's] fund, after deducting any applicable charges, must be credited to the fund," created a private property interest in favor of the inmate beneficiary. Id. (quoting Nev.Rev.Stat. § 209.241). Thereupon, the court concluded that the inmate could maintain an action under the Fifth Amendment's taking clause for the trust income because "[t]he plain language of this section ... does create a protected property interest in interest and income . . . ." Tellis, 5 F.3d at 1317. The Ninth Circuit found that the existence of a statute creating and recognizing a private property interest in trust fund income on behalf of certain beneficiaries was dispositive of the issue.

The Ninth Circuit Court of Appeals took this reasoning one step further in the case of Schneider v. California Dept. of Corrections, 151 F.3d 1194 (9th Cir. 1998). In this case, the court addressed a nearly identical fact pattern, in which the State of California allowed the state prison to keep income earned on inmates' personal trust accounts. Id. at 1196–7. The distinguishing fact in Schneider was that no statute creating a private property in interest income on inmate trust accounts existed in California. Id. The Ninth Circuit resoundingly rejected the state's arguments that state control over the funds and the lack of a statute recognizing the trust income as the private property of inmates rendered the prisoners unable to state a cause of action under the Takings Clause:

Although an explicit statutory provision may indeed be a sufficient condition to

the creation of a constitutionally cognizable property interest, *see, e.g.*, Tellis, 5 F.3d at 1317, it assuredly is not a necessary one. Notwithstanding the State's protestations to the contrary, property rights can-and often do-exist wholly independently of statutes recognizing them as such. Indeed, as the Supreme Court's decisions in Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980), and Phillips v. Washington Legal Foundation, 524 U.S. 156, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998), demonstrate, constitutionally protected property rights can-and often do-exist despite statutes, such as § 5008, that appear to deny their existence.

Schneider, 151 F.3d at 1199.

The court further held that proof of realized income from the funds was not a factor in determining whether a taking of personal property was effected. "[W]hether interest is actually earned on these funds does not affect the constitutional analysis." Id. at 1198 (quoting Schneider v. California Dep't of Corrections, 957 F.Supp. 1145, 1147, n.5 (N.D.Cal.1997)).

As one factor of many regarding the basic tenets of property ownership, the court found that the "near-universal endorsement by American courts-including California's, leave[s] us with little doubt that interest income of the sort at issue here is sufficiently fundamental that States may not appropriate it without implicating the Takings Clause." Id. at 1201 (citing to Breda Costruzioni Ferroviarie v. Los Angeles County Metro. Trans. Auth., 56 Cal.App.4th 1433, 66 Cal.Rptr.2d 416, 419-20 (1997); Pomona City Sch. Dist. v. Payne, 9 Cal.App.2d 510, 50 P.2d 822, 823 (1935)). Thus, even where no statute exists acknowledging a private property interest in trust income, the right to trust income is so essential as to be implicitly acknowledged by the constitution as a property interest which is protected by the Fifth Amendment.

In none of the cases herein examined did governmental administration of a trust fund, alone, render the trust account a "public" trust, thereby subverting the Takings Clause. The apparent factual and legal distinction between the A.B.A.T.E. case and the other cases herein cited

consists of the initial source of the funds held in trust, i.e., the state's role in the origination or production of the funds held in trust. In the A.B.A.T.E. case, the sole case to find that a "trust" was "public" and therefore, not subject to a takings claim, all of the assets placed in the "trust" corpus were produced by the state, with no private origin of the funds.

In Illinois Clean Energy, the assets in the trust fund were originally derived from the sale of a private corporation's assets, with the proceeds being used, at the State's direction, to create the trust foundation. Similarly, in the controversy before this Court, the assets in the Land Trust were originally privately owned by members of the DALB, were taken by the government for public purposes, but were subsequently relinquished and placed in the fund, by statutory direction, in order to generate compensatory income for the DALB. No portion of the assets of the Land Trust was derived from governmentally charged and originated fees, as in the A.B.A.T.E. case. Nor is the legislature's power to appropriate funds implicated in this case, as distinguished from the A.B.A.T.E. case. By returning real property to former owners via the establishment of a trust fund, the Twenty-Fifth Guam Legislature did not bind any future legislature's constitutional ability to determine "the transfer of money" in enacting 21 GCA § 80104(e), and the validity of the statute has not been challenged. A.B.A.T.E., 929 N.E.2d at 1195–96. As further differentiated from the A.B.A.T.E. case, in creating the Land Trust the Guam Legislature used specific language to divest the Government of Guam of any interest in the specified real property as trust assets, and place those assets and resulting income outside of governmental control.

Accordingly, in this circumstance, governmental administration of the Land Trust has not converted it into a public trust, and the Court finds that the specific language of 21 GCA § 80104(e) preliminarily establishes that the Land Trust is a private trust, containing assets which

are held solely for the benefit of certain private individuals, the DALB, whose members include the Plaintiffs.

"United States Supreme Court jurisprudence has recognized two types of takings, physical and regulatory." Cepeda v. Government of Guam, 2005 Guam 11 ¶ 21. "The longstanding distinction between physical and regulatory takings makes it inappropriate to treat precedent from one as controlling on the other." Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning, 535 U.S. 302, 303 (2002).

Because takings jurisprudence distinguishes between manners of takings for the purposes of compensation, the Court will eventually be required to address how the interest of the Plaintiffs is affected by Public Law 30-158, such that the law effects a particular type of taking—i.e, whether the Plaintiffs are permanently deprived of their interest, whether the Plaintiffs' interest is merely being regulated, or whether it will be physically appropriated. *See* Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 430 (1982) ("More recent cases confirm the distinction between a permanent physical occupation, a physical invasion short of an occupation, and a regulation that merely restricts the use of property.") It is unclear from the allegations made by the Plaintiffs whether they are alleging a regulatory or a physical taking effected by Public Law 30-158.

The United States Supreme Court has set forth two separate tests to determine whether a regulatory taking or a *per se*/physical taking has occurred. The court employs an "'ad hoc, factual' inquiry" to identify whether a regulatory taking of personal property or a personal property interest has occurred, and has identified three factors to determine whether the taking has been effected: "the character of the governmental action, its economic impact, and its interference

with reasonable investment-backed expectations." Monsanto, 467 U.S. 986, 1004–05 (1984)(quoting PruneYard Shopping Center v. Robins, 447 U.S. 74, 83 (1980))(citing, inter alia, Penn Central Transp. Co. v. New York, 438 U.S. 104, 124 (1978)). Alternatively, in Loretto, the United States Supreme Court announced a *per se* rule regarding takings whenever there is a permanent physical occupation of land. Loretto, 458 U.S. at 427, 434–7 (1982).

Generally, the distinction between *per se* takings and regulatory takings is clear. However, in Brown v. Legal Foundation of Washington, 538 U.S. 216 (2003), the United States Supreme Court noted that where the taking involves a regulation which results in the permanent deprivation of interest income, the line between *per se* takings and regulatory takings is not easily distinguished. In Brown, the court avoided ultimate determination of this question, but suggested that a law which entirely removes interest income and grants it to another person or entity should be categorized as a *per se* taking:

> Even the dissenters in the Court of Appeals did not disagree with the proposition that Penn Central forecloses the conclusion that there was a regulatory taking effected by the Washington IOLTA program. In their view, however, the proper focus was on the second step, the transfer of interest from the IOLTA account to the Foundation. It was this step that the dissenters likened to the kind of " per se " taking that occurred in Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). We agree that a *per se* approach is more consistent with the reasoning in our Phillips opinion than Penn Central's ad hoc analysis. As was made clear in Phillips, the interest earned in the IOLTA accounts "is the 'private property' of the owner of the principal." 524 U.S., at 172, 118 S.Ct. 1925. If this is so, the transfer of the interest to the Foundation here seems more akin to the occupation of a small amount of rooftop space in Loretto.

Brown, 538 U.S. at 235.

The court concluded, "[a] law that requires that the interest on those funds be transferred to a different owner for a legitimate public use . . . could be a per se taking requiring the payment

of 'just compensation' to the client." Id. at 240.

Based upon this reasoning, it appears that there is a distinction between confiscatory regulations (those laws which divest the owner of property ownership) and limiting regulations (those laws which regulate the use of property by the owner). *See* Phillips, 524 U.S. at 167. Cases involving confiscatory regulations would generally be found to fall into the category of *per se* takings, while cases involving limiting regulations are deemed regulatory takings. *See* Loretto, 458 U.S. at 430. However, the distinction may be blurred when a regulation deprives an owner of every stick in the recognized bundle of rights to property, excepting titled ownership. Lucas, 505 U.S. at 1017 ("Perhaps it is simply, as Justice Brennan suggested, that total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation.")(citing to San Diego Gas & Electric Co. v. San Diego, 450 U.S. 621, 652 (1981) (Brennan, J., dissenting)).

Under this guidance, Public Law 30-158 appears to effect a *per se* taking, by entirely and permanently removing the ownership of Lot Andersen South and Lot Naval Radio Station from the Land Trust and granting ownership of those lots to the 37 selected individuals. Thereby, the law permanently and wholly deprives the Plaintiffs of the income therefrom, and bestows ownership and the accompanying right to any income from the lots to the 37 selected individuals. All rights to the property will be granted to the 37 selected individuals. It appears that Public Law 30-158 effects a *per se* taking. However, even if the Court were to perform a Penn Central "ad hoc" analysis, the Court would be required to conclude that a taking has occurred.

Because the character of the governmental action in this case is to completely remove large parcels of land from the ownership of the Land Trust and vest that ownership with a small

number of private individuals for their own personal use, Public Law 30-158 completely divests the Plaintiffs of any economic use of the parcels of land. The sole purpose of the Land Trust is to hold and manage land in order to generate income for the Plaintiffs, and thus, by granting two large assets of the trust to the selected individuals, Public Law 30-158 substantially interferes with the expectation of the Plaintiffs that they will receive revenues from the use of those parcels of land, as investments of the Land Trust. Public Law 30-158 deprives the Plaintiffs of all economic value from Lot Naval Radio Station and Lot Andersen South, and thereby effects a taking under any examination.

At this preliminary juncture in the case, it is unnecessary for the Court to determine the type of taking presented. What is significant is the finding of a probable taking. For the purposes of this analysis, the Court finds that it appears that taking of personal property is duly authorized by Public Law 30-158, whether the taking is categorized as regulatory or *per se*. However, the Court notes this distinction for the parties, such that the parties may amend their pleadings and/or be further prepared to argue this distinction when it becomes relevant for the Court, either at hearing on the merits, or in regards to the determination of compensation. *See* Brown, 538 U.S. at 233.

In conclusion, under the specific terms of the Land Trust and its enacting legislation, it is clear that the permanent removal from the fund of assets consisting of two large pieces of real property, for the purpose of granting title to those lots to others, constitutes a taking of a compensable interest in property which implicates the Fifth Amendment. Because Public Law 30-158 provides no recompense to the DALB for the permanent removal of two large assets from the Trust, thereby depriving the DALB of such income producing assets in perpetuity, it likely effects

a taking which violates the Just Compensation Clause of the Fifth Amendment and Guam law.

## 2) Standing/Justiciability

The Defendants raise alternative questions of law concerning the Plaintiffs' standing to maintain the suit, arguing that even if Public Law 30-158 is determined to effect a taking, the Plaintiffs are not entitled to seek injunctive relief in a takings case, and as no property has yet been taken from them, their claims are not ripe. The Defendants argue that the Plaintiffs' sole remedy lies in an inverse condemnation suit after the implementation of Public Law 30-158.

Standing is a component of subject matter jurisdiction. Taitano v. Lujan, 2005 Guam 26, ¶ 15 (citing Guam Imaging Consultants, Inc. v. Guam Memorial Hospital Auth., 2004 Guam 15, ¶ 17 ("Standing is a threshold jurisdictional matter.")). As further held in Taitano v. Lujan, "[i]f a party does not have standing to bring a claim, a court has no subject matter jurisdiction to hear the claim." Id. Because standing is a necessary and inextricable component of subject matter jurisdiction, a challenge to a party's standing is a challenge to the court's subject matter jurisdiction, and a party may raise such arguments at any time.

The Defendants first argue that the Plaintiffs' claims are not meritorious because the Plaintiffs must pursue and exhaust the available remedy of compensation through an inverse condemnation claim under 7 GCA § 11311.1, and may not seek injunctive relief to prevent the removal of land from the Dispossessed Ancestral Landowners Trust. The Defendants argue that the Plaintiffs are not legally entitled to seek injunctive relief against a law, Public Law 30-158, in an alleged takings case under the holding of the United States Supreme Court in Ruckelshaus v. Monsanto Co., 467 U.S. 986 (1984).

It is fundamental that a party bringing an action in a court must have standing to sue.

Taitano v. Lujan, 2005 Guam 26 ¶ 15. A party invoking a court's jurisdiction must, at an irreducible minimum, show that "he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision." Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc., 454 U.S. 464, 472 (1982).

Standing is personal and in most cases does not exist where one seeks to assert the rights of another. Tileston v. Ullman, 318 U.S. 44, 46 (1943). A plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 80, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978). In general, to have standing to litigate a party must show that he has incurred, or is in immediate danger of incurring, some direct and personal injury resulting from the violation of a constitutional or statutory right designed to protect that party. Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 166–67, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); Steel Company v. Citizens for a Better Environment, 523 U.S. 83,105, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

To satisfy Article III standing requirements, a party must demonstrate an "injury in fact" and must show that it is "likely" that a favorable decision will provide redress for the injury. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351(1992). An "injury in fact" is an imminent or actual personal injury caused by the conduct being challenged, which was the result of a violation of a constitutional or statutory right. Id. A "conjectural or hypothetical" injury will not satisfy the constitutional requirements to establish standing. Id. In this context, an "imminent" injury differs from a "conjectural or hypothetical" injury in that an

imminent harm is one that is "certainly impending," and will result as a consequence of the application of the illegal act. Whitmore v. Arkansas, 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990).

As part of their standing/justiciability argument, the Defendants assert that the Plaintiffs' request for an injunction is not "ripe" at this time, because the Government of Guam has not yet taken the lands out of the trust, and should the taking occur, the Plaintiffs will have a later claim for compensation through inverse condemnation proceedings. Therefore, the Defendants reason that the Plaintiffs do not have standing to seek injunctive relief to prevent the transfer of lands from the Dispossessed Ancestral Landowners Trust by the Guam Ancestral Lands Commission, because they have sustained no injury yet, and in any event, in order receive favorable redress, they are required to seek remedies under the inverse condemnation statute rather than requesting an injunction from the Court.

A)    Availability of Equitable Relief

The Court begins its analysis aware of the fact that a similar TRO Application involving these two parties was previously denied by the District Court of Guam. In Gange v. Government of Guam, Civil No. 10-00018, 2010 WL 3294712, the district court found that the Plaintiffs were prevented from seeking an injunction or declaratory relief for an alleged governmental taking, and ordered the Plaintiffs to show cause as to the federal court's jurisdiction. Id. at *1, Order Denying Motion for Temporary Restraining Order and Order to Show Cause (D. Ct. Guam Aug. 23, 2010).

The District Court of Guam denied the petition on two grounds. First, the district court found that the petition "seeks equitable relief to enjoin what is alleged to be a taking of private property 'without requiring advance payment of just compensation as required by the [Fifth]

Amendment of United States Constitution and the Organic Act of Guam.' Docket No. 5 at 2:2-4.'"

Id. The district court based its reasoning on the holding of the United States Supreme Court, that "'[e]quitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking.'" Id. (quoting Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1016 (1984)). And "[t]he Fifth Amendment does not require that compensation precede the taking." Id. Accordingly, the district court found that, as written, the petition did not state a claim which could be appropriately addressed by a grant of injunctive relief.

Next, the district court found that the petition failed to specifically allege federal jurisdiction, stating:

> Defendants have argued that the federal question in this case, if any, is not yet ripe. See Docket No. 16 at 2:15-4:16 (citing Williamson County Regional Planning Com'n v. Hamilton Bank of Johnson City, 473 U.S. 172 (1985)). Williamson remains good law, even though it "all but guarantees that claimants will be unable to utilize the federal courts to enforce the Fifth Amendment's just compensation guarantee." San Remo Hotel, L.P. v. City and County of San Francisco, California, 545 U.S. 323, 351 (2005) (Rehnquist, C.J., concurring) (emphasis added).

Id.

The district court allowed the Plaintiffs an opportunity to amend to assert federal jurisdiction, but from the allegations of the Complaint before this Court, it is apparent they did not do so, and instead, the Court is only presented with a new suit filed in the Superior Court of Guam.

In this Court, the federal question issue is non-existent. Therefore, the only issue presented is whether injunctive relief is available to address the Plaintiff's claims regarding a governmental taking.

The Court begins its analysis of the availability of injunctive relief by examining the

preclusive effect of the opinion of the District Court of Guam. It is apparent, after reviewing the Plaintiffs' new application, that the Plaintiffs have filed a different petition, with slightly distinguished statements in support of the petition. The District Court of Guam previously found that the Plaintiffs were requesting the pre-payment of compensation, and that such compensation, preceding a taking, was not required by the Fifth Amendment of the Constitution. Gange v. Government of Guam, Civil No. 10-00018, 2010 WL 3294712, *1 (citing to Docket No. 5 at 2:2-4, finding that TRO application requested 'advance payment of just compensation'). This Court agrees with the District Court of Guam that pre-payment of compensation is not requisite in any takings case. *See* Monsanto, 467 U.S. at 1016; and Hurley v. Kincaid, 285 U.S. 95, 104 (1932). Apparently, the Plaintiffs also concede this point, as the argument that pre-payment or advance payment of compensation is necessary does not appear in the application before this Court.

In finding that the Plaintiffs were not entitled to request a TRO to enjoin the application of Public Law 30-158, the District Court of Guam relied, in total, on the Monsanto holding that; "[e]quitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking." Monsanto, 467 U.S. at 1016. This Court agrees that the Monsanto holding may preempt a court from granting injunctive relief; however, this holding is only applicable to certain takings cases. The Monsanto decision places three conditions upon the restriction of equitable relief. First, a court must find that the taking is "for a public use." Id. Next, a court must find that the taking is "duly authorized by law." Id. And finally, in order to deny injunctive relief in a takings case, a court must find that "a suit for compensation can be brought against the sovereign subsequent to the taking." Id.

Prior to finding that the Appellees were not entitled to equitable relief, the Monsanto court did, in fact, conduct its own separate analyses of these factors. The court began: "[w]e must next consider whether any taking of private property that may occur by operation of the data-disclosure and data-consideration provisions of FIFRA is a taking for a 'public use.'" Id. at 1014. Next, albeit briefly, the court determined that the taking was authorized by a law. Id. at 1016, n.19 ("Any taking of private property that would occur as a result of EPA disclosure or consideration . . . is, of course, duly authorized by FIFRA as amended in 1978."). Finally, the court proceeded to discuss whether the Appellees were afforded any manner of seeking compensation or relief subsequent to the taking by Congress, specifically, whether the Appellees could seek compensation under the Tucker Act. Id. at 1017-9. Upon an affirmative finding of all three factors, the Monsanto court determined that the Appellees were not entitled to equitable relief, either injunctive or declaratory. Id. at 1019.

Concurrently, Guam has essentially codified the first Monsanto factor, i.e., that injunctive relief is not available where the law justifies the taking for a "public purpose," in 7 GCA § 20302, which states: "An injunction cannot be granted: . . .4. To prevent the execution of a public law by officers of the law for a public benefit; . . . ." 7 GCA § 20302 (2011). Thus, it is apparent, that in this case, where an injunction is sought to enjoin the enforcement of a public law, the Court is compelled to analyze whether the law operates for a public purpose or benefit under both Monsanto and 7 GCA § 20302,.

After a review of the opinion of the District Court of Guam, it seems that the court found that the holding of the Monsanto case operates as a blanket ban against a grant of equitable relief in all takings cases. Accordingly, the court did not conduct an analysis of whether the taking under

Public Law 30-158, was for a "public purpose," as required under Monsanto and 7 GCA § 20302, nor whether the Plaintiffs are properly afforded a method for obtaining compensation under 7 GCA § 11311.1.

This Court finds nothing in the Monsanto case to indicate that equitable relief can never be afforded in a takings case. *Compare* Kelo v. City of New London, Conn., 545 U.S. 469, 475–6 (2005) (allowing petitioners to request injunction prohibiting taking, on the basis that taking violated the "public use" provision of the Fifth Amendment). Nor does 7 GCA § 20302 operate to prevent a court from enjoining the execution of a public law which provides no public benefit. Therefore, this Court distinguishes this case from the previous suit filed in the District Court of Guam, on the basis of different allegations, and the omission of the required analysis of the three Monsanto factors to determine whether the Plaintiffs have standing to request equitable relief. As in Monsanto, analysis of the second factor, whether the taking is authorized by law, is redundant under the particular facts this case; therefore, the Court will conduct its review by focusing on the issues of whether the taking is properly made for a public use or benefit, whether the Plaintiffs have been afforded a remedy by the Guam Legislature to seek compensation for this taking, and consequently, whether Plaintiffs have standing to maintain a suit for injunctive relief on these bases.

In applying the analysis of the three Monsanto factors to Public Law, the Court notes that Guam does not have an independently adopted Territorial Constitution. Rather, Guam has adopted portions of the United States Constitution as its own guarantee of rights, called the Organic Act, through 48 U.S.C.A. § 1421b(f) (West). Guam has not separately and autonomously guaranteed its citizens from takings of private property through its own legislation, but only through its

adoption of the Fifth Amendment of the United States Constitution. Government of Guam v. 162.40 Square Meters of Land More or Less, 2011 Guam 17 ¶ 15; *but cf.* 7 GCA § 11311.1 (Guam's sole statute regarding takings, providing a statutory remedy for inverse condemnation). Because the Plaintiffs merely claim that Public Law 30-158 is unconstitutional, inorganic, and illegal, without particularly specifying the manner(s) in which Public Law 30-158 has violated their rights under the constitution and the organic act, and because this determination is merely a preliminary act (i.e., a preliminary injunction analysis), the Court will analyze the Monsanto factors with regard to the Fifth Amendment.

### 1) Does Public Law 30-158 Effect a Taking for a "Public Purpose?"

"The Fifth Amendment guarantees just compensation when there is a governmental taking of private property for a *public purpose*." Cepeda v. Government of Guam, 2005 Guam 11 ¶ 20 (citing U.S. Const. amend. V ("nor shall private property be taken for public use, without just compensation."))(emphasis added); and 48 U.S.C.A. § 1421b(f) (West, Westlaw through P.L. 109-21, 2005) ("Private property shall not be taken for public use without just compensation.")). The Fifth Amendment is made applicable to Guam through the Organic Act.

Eminent domain is the ability of a government entity to openly condemn private property through judicial proceedings and provide compensation to the property owner at the time of the taking. "[I]n contrast, an "inverse" or "reverse" condemnation proceeding arises from the landowner's attempt to receive compensation for a taking of property for public purposes when the government has not brought formal condemnation proceedings." Cepeda v. Government of Guam, 2005 Guam 11 ¶ 21 (citing United States v. Clarke, 445 U.S. 253 (1980)). 7 GCA § 11311.1 is Guam's inverse condemnation statute, and for the purposes of this section of analysis, states in

relevant portion, "[a]ny person whose land was expropriated *for public purposes* by the government of Guam . . . and who has not been compensated by the government of Guam for such taking may institute an action for inverse condemnation." 7 GCA § 11311.1 (2011)(emphasis added). Obviously, and as supported in Monsanto, a governmental taking need not be preceded by payment, otherwise, inverse condemnation proceedings would be obsolete and unnecessary.

The Court begins its analysis of the Plaintiff's application and the first required Monsanto factor by noting the well-established legal principle that under the Fifth Amendment, a governmental body may not use its eminent domain power to take property of one private party for sole purpose of transferring it to another private party, even if the first party is paid just compensation. Kelo, 545 U.S. at 477–78.

The United States Supreme Court's cases have repeatedly held that "one person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid." Thompson v. Consolidated Gas Corp., 300 U.S. 55, 80 (1937); *see, e.g.*, Cincinnati v. Vester, 281 U.S. 439, 447 (1930); Madisonville Traction Co. v. St. Bernard Mining Co., 196 U.S. 239, 251–252 (1905); Fallbrook Irrigation District v. Bradley, 164 U.S. 112, 159 (1896). "[T]he Constitution forbids even a compensated taking of property when executed for no reason other than to confer a private benefit on a particular private party. A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void." Hawaii Housing Authority v. Midkiff, 467 U.S. 229, 245 (1984).

Simply put, the power of eminent domain cannot be exercised to take private property for a private purpose. Kelo, 545 U.S. at 477–78; *see also* Hawaii Housing Authority v. Midkiff, 467

U.S. 229, 245 (1984); Allegheny County v. Frank Mashuda Co., 360 U.S. 185, 187–8, 190 (1959); and Pine Grove Tp. v. Talcott, 86 U.S. 666, 676 (1873). The text of 7 GCA § 11311.1, Guam's inverse condemnation statute, reaffirms the proposition that a governmental taking of land in Guam must be for a public purpose. The specific language of the Fifth Amendment further confirms and highlights the government's authority to confiscate private property, with two conditions imposed on the exercise of such authority: 1) the taking must be for a public use, and 2) just compensation must be paid to the owner. U.S. Const. amend. V; Brown v. Legal Foundation of Washington, 538 U.S. 216, 231–2 (2003); and Government of Guam v. 162.40 Square Meters of Land More or Less, 2011 Guam 17 ¶ 15.

The first factor is generally known as the Public Use Clause, and the second factor is known as the Just Compensation Clause. Although injunctive relief is not available to a plaintiff who merely seeks compensation under the Just Compensation Clause, injunctive relief is definitively available whenever there is a clear violation of the Public Use Clause;

> [A] Public Use Clause claim is ripe before the plaintiff seeks just compensation through state procedures because such "proceedings do not supply the appropriate remedy." A plaintiff that proves that a government entity has taken its property for a private, not a public, use is entitled to an injunction against the unconstitutional taking, not simply compensation.

Carole Media LLC v. New Jersey Transit Corp., 550 F.3d 302, 308 (3rd. Cir. 2008)(quoting Montgomery v. Carter County, 226 F.3d 758, 767 (6th Cir.2000)).

Here, the Court concerns itself only with the public use factor, as part of the required Monsanto analysis, and if it is determined that the governmental taking effected by Public Law 30-158 is not intended for a legitimate public use, as prohibited by the Public Use Clause, the taking is unconstitutional, and injunctive relief is the available and appropriate remedy in such situations.

Id. (plaintiff sought declaratory and injunctive relief or, in the alternative, just compensation for alleged taking for private use, and was eligible for injunctive relief upon appropriate showing); *see also* Fideicomiso De La Tierra Del Cano Martin Pena v. Fortuno, 604 F.3d 7, 16 (1st Cir. 2010); Rumber v. District of Columbia, 487 F.3d 941, 944 (D.C.Cir.2007); Montgomery, 226 F.3d at 766-67; McKenzie v. City of White Hall, 112 F.3d 313, 317 (8th Cir.1997); Armendariz v. Penman, 75 F.3d 1311, 1320-21 & n. 5 (9th Cir.1996) (en banc); Samaad v. City of Dallas, 940 F.2d 925, 936-37 (5th Cir.1991); *accord* Kelo, 545 U.S. at 475–6 (2005)(plaintiff permitted to seek injunctive relief for alleged violation of Public Use Clause).

The United States Supreme Court has long rejected the narrow interpretation of public use as actual "use by the general public," and has, instead "embraced the broader and more natural interpretation of public use as 'public purpose.'" Kelo, 545 U.S. at 480 (citing to Fallbrook Irrigation Dist. v. Bradley, 164 U.S. 112, 158–164 (1896); and Strickley v. Highland Boy Gold Mining Co., 200 U.S. 527, 531 (1906).

In adopting this "public purpose" definition, the United States Supreme Court has defined "public purpose," expansively, reflecting a longstanding policy of judicial deference to legislatively declared judgments concerning the public good. Kelo, 545 U.S. at 480. Accordingly, the "public use" requirement of the Fifth Amendment is "coterminous with the regulatory power" of the legislature, and the judiciary will not strike down a taking on basis that it lacks a physical public use of the property, so long as the taking is actually related to a conceivable public purpose. National R.R. Passenger Corp. v. Boston and Maine Corp., 503 U.S. 407, 422 (1992).

In every instance where a court or the judiciary examines the constitutionality of a taking and whether that taking is for a public purpose, "each case must turn on its own facts." Berman

v. Parker, 348 U.S. 26, 32 (1954). "The mere fact that property taken outright by eminent domain is transferred in the first instance to private beneficiaries does not condemn that taking as having only a private purpose." Hawaii Housing Authority v. Midkiff, 467 U.S. 229, 244 (1984). The analysis of whether a use is public or private is determined by the nature and purpose to which the property is either put, or will be put in the future, despite its initial transfer to a private entity. Kelo, 545 U.S. at 482, 485–486, and n.14; and Rindge Co. v. Los Angeles County, 262 U.S. 700, 707 (1923). "[W]hat in its immediate aspect [is] only a private transaction may . . .be raised by its class or character to a public affair." Block v. Hirsh, 256 U.S. 135, 155 (1921). "[I]t is only the taking's purpose, and not its mechanics, that must pass scrutiny under the Public Use Clause." Hawaii Housing Authority v. Midkiff, 467 U.S. 229, 244 (1984).

Essentially, the United States Supreme Court has recognized two primary categories of legitimate public uses under the Takings Clause: (1) takings that transfer private property to public ownership, resulting in governmental administration of lands on behalf of the public, *see, e.g.*, Old Dominion Land Co. v. United States, 269 U.S. 55, 66, 46 S.Ct. 39, 70 L.Ed. 162 (1925); United States v. Gettysburg Elec. Ry. Co., 160 U.S. 668, 681-83, 16 S.Ct. 427, 40 L.Ed. 576 (1896); Shoemaker v. United States, 147 U.S. 282, 297, 13 S.Ct. 361, 37 L.Ed. 170 (1893); and (2) takings that ultimately make use of the property for the benefit of the general public or at least a significant portion of the community, *see* Kelo, 545 U.S. at 478-79 (noting this category of transfers has long been deemed "sufficient to satisfy the public use requirement"); *see e.g.*, Midkiff, 467 U.S. at 241–42; and Berman, 348 U.S. at 33–36.

Similarly, in the governmental takings context in Guam, a "public use" is defined as "any use of purpose inuring to the benefit of the public generally or any substantial segment thereof.

*When the Guam Legislature declares a use to be public*, such use shall be presumed to be an authorized public use, but the contrary may be proved." 21 GCA § 15103 (2011)(emphasis added).

A)    May the Court Presume Public Purpose Pursuant to 21 GCA § 15103, Under an Organic/Territorial/Statutory Analysis?

Public Law 30-158 specifically provides in Section 1, regarding the legislative findings and intent of the law, that "I Liheslatura intends to transfer these lands via a land exchange to satisfy the claims of the original and ancestral landowners of Tiyan properties . . . . I Liheslatura does not intend that the properties identified herein be made available to DOD." Public Law 30-158, p. 2, lines 12–16. As stated in this section, the Guam Legislature based its decision to transfer Lot Andersen South and Lot Naval Radio Station from the Land Trust to the selected individuals on the basis that "[t]he original landowners have fervently testified they wish to receive these lands and to retain these lands for their families . . . ." Public Law 30-158, p. 2, lines 16–17.

In declaring this intent, the Guam Legislature stated in Section 2 of the law:

These lands are being returned via a land exchange with the intent of ensuring that future generations of these families, many who were left landless after the war, would never suffer that fate again, and in light of the testimonies by the families that they do not intend to transfer or facilitate a transfer to DOD in contravention of Public Law 30-21, or the Ancestral Lands Commission's position, but that they intend to preserve this historical property for their families and future generations.

Public Law 30-158, pp. 2–3, lines 26–27 and lines 1–5.

In effecting this intent, the Guam Legislature provided:

Section 3. Within one hundred eighty (180) days after the enactment of this Act, all original landowners of properties transferred to the A. B . Won Pat International Airport Authority (GIAA) by the United States of America, but whose properties were retained by GIAA shall be deeded by the Guam Ancestral Lands Commission (GALC) and I Maga'lahen Guahan (the Governor of Guam), from the real properties identified in Section 2 of this Act, their proportionate share of property

retained and not returned to them by GIAA . . . .

Public Law 30-158, p. 3, lines 15–21.

In this case, Public Law 30-158 does not purport to take Lot Andersen South and Lot Naval Radio Station in order to transfer the lots to the Government of Guam or any of its agencies or other governmental entities. Rather, the sole stated intent of Public Law 30-158 is to take Lot Andersen South and Lot Naval Radio Station out of the Land Trust and transfer these lots to private individuals. Because the plain language of Public Law 30-158 does not attempt to transfer these lots into governmental hands for public administration and ownership, the Court is presented only with the possibility of a taking which falls into the latter category of permissible public purposes, in which property is transferred to private ownership in furtherance of goals which will ultimately benefit the public. *Cf.* Fideicomiso De La Tierra Del Cano Martin Pena v. Fortuno, 604 F.3d 7, 19 (1st Cir. 2010)("Law 32, by its terms, revokes the transfer of public agencies' lands to the Fideicomiso and returns the lands to public ownership through agencies of the Commonwealth and the Municipality. There can be no doubt that Law 32's transfer to public ownership is for 'public use' under the Takings Clause.")

Under the Public Use Clause, the United States Supreme Court has examined three primary cases in which private property was first transferred to another private party. *See, e.g.,* Kelo, 545 U.S. at 478-83; Midkiff, 467 U.S. at 241-42; and Berman, 348 U.S. at 33-36.

In Berman, the oldest case, appellants, the owners of a department store, challenged the constitutionality of the District of Columbia Redevelopment Act of 1945, 60 Stat. 790, D.C.Code 1951, ss 5-701 to 5-719, under the Public Use Clause, as the act effected a taking of appellants' property, a department store, by granting it to a private developer. The act created "the District of

Columbia Redevelopment Land Agency (hereinafter called the Agency), composed of five members, which was granted power by s 5(a) to acquire and assemble, by eminent domain and otherwise, real property . . . ." Id. at 29. The Agency's purpose was to receive and approve, "after a public hearing"and after conducting comprehensive research, a redevelopment land-use plan, "which designates land for use for 'housing, business, industry, recreation, education, public buildings, public reservations, and other general categories of public and private uses of the land.'" Id. However, under section 7(g) of the act, preference was "given to private enterprise over public agencies in executing the redevelopment plan." Id. at 30.

The appellants objected to the taking of their private real property for the proposed transfer to another private enterprise in order to effectuate the plan. However, the stated purpose of the acquisition of the real property under the act was to effect "'the redevelopment of blighted territory in the District of Columbia and the prevention, reduction, or elimination of blighting factors or causes of blight'." Id. (quoting District of Columbia Redevelopment Act of 1945, 60 Stat. 790, D.C.Code 1951, ss 5-701 to 5-719, Section 6(a)). Within the terms of the act, Congress made a specific "legislative determination" that:

> conditions existing in the District of Columbia with respect to substandard housing and blighted areas, including the use of buildings in alleys as dwellings for human habitation, are injurious to the public health, safety, morals, and welfare, and it is hereby declared to be the policy of the United States to protect and promote the welfare of the inhabitants of the seat of the Government by eliminating all such injurious conditions by employing all means necessary and appropriate for the purpose.

Id. at 30 (quoting District of Columbia Redevelopment Act of 1945, 60 Stat. 790, D.C.Code 1951, ss 5-701 to 5-719, Section 2).

Thus, despite the private means and manner of the condemnation, the United States

Supreme Court upheld the law and the taking, finding that the legislatively supported and declared public purpose fulfilled the requirements of the Public Use Clause of the Fifth Amendment. Id. at 33–34.

In Midkiff, the United States Supreme Court addressed the problem of concentrated residential real property ownership in Hawaii. In Midkiff, the Hawaii Legislature conducted an exhaustive study of the problem, and "after extensive hearings, the Hawaii Legislature discovered that, while the State and Federal Governments owned almost 49% of the State's land, another 47% was in the hands of only 72 private landowners." Midkiff, 467 U.S. at 232. "The legislature concluded that concentrated land ownership was responsible for skewing the State's residential fee simple market, inflating land prices, and injuring the public tranquility and welfare." Id. Specifically, the Hawaii Legislature made a finding that concentrated land ownership was a problem affecting the public in general, and negatively impacting nearly all residents of Hawaii by creating a residential housing shortage. Id.

In order to alleviate this legislatively declared public problem, "the Hawaii Legislature enacted the Land Reform Act of 1967 (Act), Haw.Rev.Stat., ch. 516, which created a mechanism for condemning residential tracts and for transferring ownership of the condemned fees simple to existing lessees." Id. at 233. In this act, the Hawaii Legislature stated that its sole intent was to "effectuate the public purposes" of the act by redistributing available residential housing from the hands of the few to the hands of many, and to thereby decrease the economic housing pressures faced by the majority of Hawaii residents. Id. The act further required compliance with extensive procedural safeguards to ensure that "these public purposes will be served." Id.

The United States Supreme Court upheld this taking under the Public Use Clause, giving

deference to the provisions of the act regarding "public purpose," because the Hawaii Legislature bolstered and supported its law with exhaustive research, affirmative findings, and a declaration that legislation was necessary to benefit the public by eliminating a problem affecting the majority of its residents. Id. at 236–37. Thereupon, the United States Supreme Court found that the Hawaii Legislature had properly enacted the act "to attack certain perceived evils of concentrated property ownership in Hawaii—a legitimate public purpose." Id. at 245.

In Kelo, the most recent case, the city of New London, Connecticut approved "an integrated development plan designed to revitalize its ailing economy," and purchased most of the property necessary for the plan, "but initiated condemnation proceedings when petitioners, the owners of the rest of the property, refused to sell." Kelo, 545 U.S. at 471. "In addition to creating jobs, generating tax revenue, and helping to 'build momentum for the revitalization of downtown New London,' the plan was also designed to make the City more attractive and to create leisure and recreational opportunities on the waterfront and in the park." Id. at 474–75 (internal citations omitted).

As in Midkiff and Berman, prior to initiating condemnation proceedings, the city conducted extensive research regarding the plan, employing various state agencies and consultants to evaluate "the project's economic, environmental, and social ramifications." Id. at 473, n.2. The city authorized the takings under chapter 132, the State's municipal development statute, which expressly provides "a legislative determination that the taking of land, even developed land, as part of an economic development project is a 'public use' and in the 'public interest.'" Id. at 476 (citing to Conn. Gen.Stat. § 8–186 et seq. (2005)).

The plurality opinion, written by Justice Stevens, reasoned that the taking did not violate

the Public Use Clause of the Fifth Amendment because the act authorizing the takings contained a specific legislative finding that "economic development" was a public purpose, and judicial deference should be given to legislative findings concerning the public good. Thus, the plurality declined to second-guess the state legislature's declaration, and upheld the taking. The plurality further reasoned that the circumstances of this particular taking did not merit judicial scrutiny, as the taking "would be executed pursuant to a 'carefully considered' development plan," and "[t]he trial judge and all the members of the Supreme Court of Connecticut agreed that there was no evidence of an illegitimate purpose in this case." Id. at 478. Based upon these factors, the plurality found that there was little risk that the city would "be allowed to take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit." Id.

Although Guam does not independently or separately safeguard its citizens from governmental takings through its own legislation, and derives its takings protections solely from the Fifth Amendment of the United States Constitution, Guam has recently adopted its own standard by which to analyze takings under the Fifth Amendment.

In Government of Guam v. 162.40 Square Meters of Land More or Less, 2011 Guam 17, the Supreme Court of Guam very recently examined a case in which the Guam Legislature exercised the power of eminent domain by enacting Public Law 16-118, which effected a transfer of real property from one family to another. The purpose of this legislative taking was to create a right of way for a landlocked parcel of real property, and thereby to carry out the purposes of the "Agana Plan," originally adopted in 1947, in the aftermath of World War II. Under the Agana Plan, "[t]he U.S. military and local government agreed to reconstruct the war-ravaged village, but recognized that following the pre-war lot lines could potentially create an unsanitary environment

and turn Agana into a slum." Id. at ¶ 2 (internal citations omitted). "They created the Agana Plan to straighten the village lot lines and streets into modern, geometric blocks, which they acknowledged would result in some abandoned streets and fractional pieces of the old lots." Id. (citing to Tr. at 14-16 (Bench Trial, Jan. 21, 2009); and Gov't of Guam v. Moylan, 407 F.2d 567, 567 (9th Cir. 1969)).

In 162.40 Square Meters of Land, the Supreme Court of Guam found that the Agana Plan was supported by research and specific findings regarding development and the prevention of slums, and that "neither party questions the validity of the original Agana Plan as an economic development plan, nor do the parties challenge the premise that a taking for economic development satisfies the "public use" requirement." Id. at ¶ 17. The court further held that because the taking effected by Public Law 16-118 was stated to be in accordance with the Agana Plan, the taking was proper, noting that the plan had previously been upheld under the Public Use Clause: "the Ninth Circuit in Moylan held that the Agana Plan qualifies as a valid 'public purpose' under the Public Use Doctrine." Id.

For most purposes, disregarding the controversial and somewhat convoluted standard set forth in Kelo (as more fully discussed in the next section), the Supreme Court of Guam opted instead to follow the previous majority reasoning of Justice O'Connor in Midkiff, and thereupon adopted its own rational basis test for such cases where the legislature has expressed a public intent in enacting condemnation legislation: "The standard that we adopt is one of a limited review such that "where the exercise of the eminent domain power is rationally related to a conceivable public purpose, the Court has never held a compensated taking to be proscribed by the Public Use Clause." Id. at ¶ 23 (citing Midkiff, 467 U.S. at 241). However, the court did not identify or

propose a formula to be applied whenever the Guam Legislature has failed to adopt or specifically set forth a public purpose intent, noting only, "[w]e are reluctant, however, to find legislative intent when there is none." Id. at ¶ 28.

In accordance with 162.40 Square Meters of Land, the Court will begin its analysis by determining whether Public Law 30-158 contains any statement that the purpose of the taking of Lot Naval Radio Station and Lot Andersen South is for a public benefit, and is therefore rationally based upon a public purpose and entitled to deference under either 21 GCA § 15103 or the new Organic Act/Guam rational basis standard.

Regarding takings legislation, "in determining legislative intent, a statute must be read as a whole, as well as to its objects and policy." 162.40 Square Meters of Land, 2011 Guam 17 ¶ 27. "Absent clear legislative intent to the contrary, the plain meaning prevails." Id. (quoting Sumitomo Const., Co., Ltd. v. Gov't of Guam, 2001 Guam 23 ¶ 17). A plain reading of the law reveals that no specific language is contained within Public Law 30-158 declaring that the transfer of lands to a few identified individuals will benefit the public, the community, or any substantial segment of it, see 21 GCA § 15103, nor is there any declaration that the transfer of these lands to a few identified individuals will eradicate a perceived harm to the public, see Midkiff, 467 U.S., at 245, nor is there a stated purpose that the transfer from the Land Trust to these selected private individuals will effect a salutary or economic use of the property by the community, or that the taking will serve the public welfare, see Kelo, 545 U.S. at 478-79, Berman, 348 U.S. at 32, and 162.40 Square Meters of Land, 2011 Guam 17 at ¶ 24.

In each of the three cases examined by the United States Supreme Court, where taken property was transferred to another private party, the public law effecting the taking contained a

definite statement that the purpose of the law was to provide a benefit to the public. Id. at 476 (citing 268 Conn., at 18–28, 843 A.2d, at 515–521 ("That statute expresses a legislative determination that the taking of land, even developed land, as part of an economic development project is a 'public use' and in the 'public interest.'")); Midkiff, 467 U.S. at 236 ("The [challenged] Act unambiguously provides that '[t]he use of the power . . .to condemn . . .is for a public use and purpose.'"); and Berman, 348 U.S. at 29 (quoting the District of Columbia Redevelopment Act of 1945, 60 Stat. 790, D.C.Code 1951, Section 2 ("'the acquisition and the assembly of real property and the leasing or sale thereof for redevelopment pursuant to a project area redevelopment plan . . .is hereby declared to be a public use.'")).

This holds true for the recent case decided by the Supreme Court of Guam, which found, "[t]he stated public purpose of the Agana Plan is to promote the economic development of the city and 'establishing order out of chaos' by straightening the border lines and uniting fractional lots in order to form geometric, orderly blocks." 162.40 Square Meters of Land, at ¶ 24 (quoting Moylan, 407 F.2d at 567).

The case before this Court is distinguished in that no such legislative finding or declaration of public purpose, benefit, or use is present in the provisions of Public Law 30-158. Instead, Public Law 30-158 declares that the sole purpose of the transfer is to provide compensation and benefit to the 37 identified and selected private individuals, without a statement that such use by these private individuals is declared to be a public use. Public Law 30-158, p. 2–3, lines 26–27 and lines 1–5. This stated purpose stands in stark contrast to the aforesaid decisions of the United States Supreme Court and the Supreme Court of Guam upholding challenged legislative takings under the Public Use clause. Kelo, 545 U.S. at 478 (finding "the City's development plan was not

adopted "to benefit a particular class of identifiable individuals."); Midkiff, 467 U.S. at 245 ("The Hawaii Legislature enacted its Land Reform Act not to benefit a particular class of identifiable individuals but to attack certain perceived evils of concentrated property ownership in Hawaii—a legitimate public purpose."); Berman, 348 U.S. at 33–34 ("Here one of the means chosen is the use of private enterprise for redevelopment of the area. Appellants argue that this makes the project a taking from one businessman for the benefit of another businessman. But the means of executing the project are for Congress and Congress alone to determine, once the public purpose has been established.") (internal citations omitted); and 162.40 Square Meters of Land, 2011 Guam 17 at ¶ 35 ("this is not a case that involves merely providing an easement to a private party . . . .The taking of Lot 237-3-2-1 was part of a larger and more comprehensive economic development plan and was, therefore, for a public purpose. The mere fact that the taking provided an incidental benefit to a private party does not invalidate the taking as long as there is a valid public purpose.").

After both a literal and plain reading, it is apparent that Public Law 30-158 contains no legislatively declared public purpose. Public Law 30-158 contains only a statement that this law will privately benefit the 37 selected individuals. Public Law 30-158, pp. 2–3, lines 12–17, 26–27 and lines 1–5. No comprehensive public plan for the taking is suggested, nor is any public/community benefit or economic development purpose found within its provisions. Accordingly, the law is not entitled to deference under 21 GCA § 15103 or the rational basis standard adopted by the Supreme Court of Guam.

B)    May the Court Presume Public Purpose Under United States Supreme Court Precedent, or Other Constitutional Case Law?

The United States Supreme Court has posited that the judiciary will afford deference to the

legislative branch in determining what constitutes a matter of public interest. *See* Berman, 348 U.S. at 32. However, in the takings context, the United States Supreme Court has also intimated that the judiciary should not always accept the findings of the legislature without question. In Lucas v. South Carolina Coastal Council, 505 U.S. 1003, the Court acknowledged that "[o]ur cases have not elaborated on the standards for determining what constitutes a 'legitimate state interest[,]' [but] [t]hey have made clear ... that a broad range of governmental purposes and regulations satisfy these requirements" Id. at 1023 (quoting Nollan v. California Coastal Comm'n, 483 U.S. 825 at 834–835 (1987)). The United States Supreme Court currently appears divided as to the judicial deference to be given to legislative findings, when particular legislative findings declaring a public purpose have been made. Kelo, 545 U.S. 469.

Although the United States Supreme Court has not yet fully addressed this particular question, it seems that under any precedent of the United States Supreme Court, where a legislatively declared public purpose is omitted from an act which effects a taking for the benefit of certain private individuals, the act is not entitled to preferential examination under the Public Use Clause. Kelo, 545 U.S. at 491–93 (Kennedy, J., concurring); and Lucas, 505 U.S. at 1025–26.

Interestingly, the Kelo decision was a plurality decision in which the plurality of four justices reasoned that when the legislature affirmatively makes findings that a particular purpose will benefit the public, the judiciary will not second-guess those legislatively made judgments by applying a heightened form of review. Id. at 488–89, and n.20 ("Our review is limited to determining that the purpose is legitimate and that Congress rationally could have believed that the provisions would promote that objective"). The plurality did not address the standard to be applied when no public purpose is declared by a legislating body.

Page 54 of 79

In disagreement with the plurality's rationale, the four dissenting justices espoused the opinion that the Court should play a more important role "in reviewing a legislature's judgment of what constitutes a public use." Id. at 500 (O'Connor, J., dissenting); and 517 (Thomas, J., dissenting)("There is no justification, however, for affording almost insurmountable deference to legislative conclusions that a use serves a 'public use.' To begin with, a court owes no deference to a legislature's judgment concerning the quintessentially legal question of whether the government owns, or the public has a legal right to use, the taken property."). Notably, Justice O'Connor, who had previously written the majority opinion in Midkiff (as recently adopted by the Supreme Court of Guam), urged that the plurality should not stray from the rational basis test of Midkiff through its adoption of a standard of nearly unconditional acceptance of legislative findings of public purpose. Id. at 500 (O'Connor, J., dissenting). Perhaps more importantly for this Court's purposes, Justice O'Connor's dissent also briefly mentions the scenario in which a legislature omits a statement of public purpose, as presented to this Court, and will be more fully discussed later in this opinion.

The Kelo decision turned on the concurrence of Justice Kennedy, who agreed only with the narrow contention that the judiciary should not apply scrutiny to those takings which are effected for the stated purpose of economic development. Id. at 493 (Kennedy, J., concurring). Justice Kennedy agreed to unqualified judicial acceptance and deference in favor of legislative findings only in those cases where the legislature has specifically found that a taking will promote the recognized public purpose of economic development, where such finding is supported both by research regarding such public benefit, and where there has been governmental compliance with "elaborate procedural requirements" designed to eliminate abuse of the takings clause. Id. Justice

Kennedy tangentially addressed the issue of whether deference should be afforded to takings legislation which omits a stated public purpose, and specifically wrote to express the idea that when such underlying factors as research, planning and safeguards are absent, and where the taking at issue does not appear to foster a public purpose, but instead, facially purports to benefit identified private individuals at the expense of others, heightened scrutiny should be applied by the judiciary:

> My agreement with the Court that a presumption of invalidity is not warranted for economic development takings in general, or for the particular takings at issue in this case, does not foreclose the possibility that a more stringent standard of review than that announced in Berman and Midkiff might be appropriate for a more narrowly drawn category of takings. There may be private transfers in which the risk of undetected impermissible favoritism of private parties is so acute that a presumption (rebuttable or otherwise) of invalidity is warranted under the Public Use Clause.

Id. at 491 (Kennedy, J., concurring)(internal citations omitted).

While the plurality concluded that judicial deference should always be given to the decisions of the legislative branch regarding what constitutes a public purpose, Justice Kennedy held that judicial deference is not required in all cases. Justice Kennedy proposed that in some cases, no deference should be given to legislation, and heightened review might be required in certain circumstances, possibly where no public purpose is stated. Justice Kennedy supported the plurality's result on the sole, restricted basis that the legislature had affirmatively declared that the taking's purpose was economic development, noting, "[t]his demanding level of scrutiny, however, is not required simply because the purpose of the taking is economic development." Id. at 493. Because the concurrence of Justice Kennedy, particularly regarding the level of judicial deference given to a legislative finding of public purpose, was decided on the narrowest grounds, and was

pivotal to the decision, his concurrence becomes the effective holding of the court. People v. Angoco, 2007 Guam 1 ¶ 21 (citing to Marks v. United States, 430 U.S. 188, 193-94 (1977)("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices," the position espoused by the Justices who concur in the opinion on the narrowest grounds "constitute[s] the holding of the Court and provide[s] the governing standards")).

Although his opinion sets forth the standard of Kelo, Justice Kennedy declined to specifically and particularly define the circumstances in which a hypothetical higher standard of judicial scrutiny would be required. Justice Kennedy instead listed factors which convinced him that the taking presented in Kelo was not unconstitutional. Id. Reviewing these factors, it is unclear whether Justice Kennedy intended to set forth a standard of higher scrutiny of only those legislative acts which do not concern economic development, or whether higher scrutiny should be required in those cases which do not concern economic development and which also do not meet the factors he outlined, i.e., those takings which do not occur "in the context of a comprehensive development plan," and where "[t]he identities of most of the private beneficiaries [are] unknown," and where there is no "compli[ance] with elaborate procedural requirements that facilitate review of the record and inquiry into the [government's] purposes." Id.

In her dissenting opinion, Justice O'Connor expressed displeasure with the vagueness of Justice Kennedy's judicial deference analysis, stating, "[w]hatever the details of Justice Kennedy's as-yet-undisclosed test, it is difficult to envision anyone but the 'stupid staff[er]' failing it." Id. at 502 (quoting Lucas, 505 U.S. at 1025–1026, n. 12). Justice O'Connor noted, id., that the United States Supreme Court had previously rejected the view that "with respect to regulations that deprive an owner of all developmental or economically beneficial land uses, the test for required

compensation is whether the legislature has recited a harm-preventing justification for its action." Lucas, 505 U.S. at 1025–1026, n. 12). Justice O'Connor espoused the opinion that courts should not always adopt a standard of deference to a legislature's statements of public purpose regarding economic development, id. at 502: "[s]ince such a justification can be formulated in practically every case, this amounts to a test of whether the legislature has a stupid staff. We think the Takings Clause requires courts to do more than insist upon artful harm-preventing characterizations." Lucas, 505 U.S. at 1025–1026, n. 12.

Whatever the disagreement between the justices of the United States Supreme Court regarding the level of deference to afford a legislative finding of public purpose, one common concept can be discerned from the three Kelo opinions—deference to the legislature's determination of public purpose can only be given when there is a legislatively declared public purpose. The judiciary cannot defer to the legislature's determination of public purpose if the legislature has made no such determination. Because Public Law 30-158 fails to include any statement of public purpose, the standard of judicial deference enunciated by the Guam Supreme Court does not afford much guidance to an analysis of these facts. The Supreme Court of Guam's rational basis test applies only to legislation which contains an expressly stated and supported intent to benefit the public, although the opinion does indicate that the Court should not presume a legislative intent where none is stated. Government of Guam v. 162.40 Square Meters of Land More or Less, 2011 Guam 17 ¶¶ 23 and 28. The Court must look to the guidance of the United States Supreme Court and other jurisdictions in this circumstance.

Although Justice Kennedy did not elaborate upon the particular factors to be applied to determine when a taking should be presumed to meet the public purpose test, it appears that Justice

Kennedy's intent in writing the Kelo concurrence was to steer the Court away from both presumptions of validity and either a minimum scrutiny or rational basis test, and instead require trial courts to employ a fact-based test for determining public purpose in takings cases at trial on the merits. Id. at 492.

The case before this Court is not yet at the trial stage, and therefore, the Court need not yet conduct this fact intensive analysis. However, in determining presumptive validity, on its face, the circumstances stated in Public Law 30-158 seem to fit the concept of a taking in which the plurality opinion, the dissenting opinion, and Justice Kennedy's concurrence would require heightened scrutiny of the law, or at least no presumption of public purpose. Public Law 30-158 does not implicate economic development as its purpose, and does not specifically designate any purpose of the law as a public purpose. In fact, Public Law 30-158 appears to fail the "stupid staff[er]" test set forth in the Kelo dissent and Lucas, as Public Law 30-158 makes no legislative finding, supported or unsupported, that the law's enactment and its particular condemnation will serve a public goal. Kelo, 545 U.S. at 502 (O'Connor, J., dissenting)(citing to Lucas, 505 U.S. at 1025–1026, n. 12). More importantly, the taking effected by Public Law 30-158 clearly benefits specific selected individuals, and effectively appears to make use of the power of eminent domain to take from a certain group of individuals in order to give to a select few.

Other jurisdictions have also expressed the idea that no judicial deference should be afforded to takings legislation which does not clearly indicate that the public interest is the foremost consideration:

> Where, as here, the condemnation power is exercised in a way that benefits specific and identifiable private interests, a court inspects with heightened scrutiny the claim that the public interest is the predominant interest being advanced. Such

public benefit cannot be speculative or marginal but must be clear and significant if it is to be within the legitimate purpose as stated by the Legislature.

Tolksdorf v. Griffith, 464 Mich. 1, 9, 626 N.W.2d 163, 168 (Sup. Ct. Mich. 2001)(quoting Poletown Neighborhood Council, Inc. v. Detroit, 410 Mich. 616, 634--5, 304 N.W.2d 455 (Sup. Ct. Mich. 1981)); *accord* Broad v. Sealaska Corp., 85 F.3d 422, 431, n. 5 (9th Cir. 1996)("takings for a private use, as opposed to a public use, are presumptively unconstitutional."); City of Arlington, Tex. v. Golddust Twins Realty Corp., 41 F.3d 960, 963 (5th Cir. 1994) (a legislative declaration "is binding on the court unless it is manifestly wrong or unreasonable, or the purpose for which the declaration is enacted is clearly and [palpably] private") (citation and internal quotation marks omitted); Armendariz, 75 F.3d at 1321; and 99 Cents Only Stores v. Lancaster Redevelopment Agency, 237 F.Supp.2d 1123, 1129 (C.D.Cal.2001);("No judicial deference is required, for instance, where the ostensible public use is demonstrably pretextual.").

The Guam Legislature failed to designate any public use or benefit stemming from the taking effected by this law. Moreover, the law identifies 37 specific individuals as the sole beneficiaries of the taking. The plain, legislatively stated purpose of Public Law 30-158 is to benefit certain private individuals. Accordingly, under United States Supreme Court precedent and the precedent of other jurisdictions, the Court cannot presume a public purpose for Public Law 30-158.

         C)     Does Public Law 30-158 Contain an Apparent Public Purpose Under Any Standard?

Justice Kennedy indicated that even when a court does not apply a heightened standard of review, "[a] court applying rational-basis review under the Public Use Clause should strike down

a taking that, by a clear showing, is intended to favor a particular private party, with only incidental or pretextual public benefits . . . ." Kelo, 545 U.S. at 491 (Kennedy, J., concurring).

Whether the Court applies a rational-basis test or another standard of review, after an analysis of the entirety of Public Law 30-158, it is apparent that there is no "clear" or "significant" public benefit stated within its provisions. Under either the Kelo plurality analysis or Justice Kennedy's concurring analysis, the act's language unquestionably benefits a few selected individuals, with the sole stated purpose of benefitting those individuals, and only those individuals. No recognized public use of the taken property or public purpose served by the taking can be gleaned from the history, intent, or provisions of the law. The act does not purport to promote "economic development," for the purposes of fostering employment and community growth, see Kelo, 545 U.S. at 484-85; the act does not contain a finding of intent to promote land development for agricultural purposes or other use of natural resources, Strickley, 200 U.S. 527; the act does not apparently promote the beautification or development of land for the purposes of improving the quality of life for the public or the community, Berman, 348 U.S. at 33; and the act's language is not aimed at correcting a deficiency in the real estate market or any other market, which operates as a barrier to a public goal, Midkiff, 467 U.S. at 242; accord Monsanto, 467 U.S. at 1014-1015 (law aimed at eliminating a "significant barrier to entry in the pesticide market").

The primary stated purpose of Public Law 30-158 is to transfer the lots out of the Land Trust, held for the benefit of the many dispossessed ancestral landowners, in order to give these lots to a few identified and selected individuals. The secondary stated purpose of the law is to keep the lots out of the hands of the public, and to prevent the taking and use of these lots by the United States government for defense purposes. Public Law 30-158, p.1, lines 5-7 ("the Department of

Defense (DOD) has once again stated its desire to take these lands, even if it has to resort to eminent domain to support the massive military buildup."), and p. 2 lines 15–16 ("I Liheslatura does not intend that the properties identified herein be made available to DOD.") Without comment on the viability of this latter intent, the Court notes that the use of eminent domain by the United States for military purposes constitutes a long-standing and well recognized public purpose. *See* Kohl v. United States, 91 U.S. 367, 371–372 (1876) (noting Federal Government's power to take property "needed for forts, armories, arsenals, and navy-yards"); Portsmouth Harbor Land & Hotel Co. v. U.S., 260 U.S. 327, 329 (1922)(government installation of a coast defense battery, with the purpose of the government to fire projectiles directly across it for practice, during peace time, constituted a valid governmental taking); Highland v. Russell Car & Snowplow Co., 279 U.S. 253, 260 (1929)(Governmental control of manufacture of snowplows during war was "public use," for which power of eminent domain may be exercised); and U.S. v. Westinghouse Elec. & Mfg. Co., 339 U.S. 261, 262, n. 1(1950)(The Second War Powers Act authorizing officials to acquire by condemnation any real property, for army occupation, or other interest therein for purposes related to the war properly confers power to condemn interests in realty). Public Law 30-158 states that it intends to subvert any attempt of the United States to condemn these lands by achieving and maintaining purely private ownership of these lands. Public Law 30-158, pp. 2–3, lines 26–27 and 1–5 ("These lands are being returned . . . in light of the testimonies by the families that they do not intend to transfer or facilitate a transfer to DOD . . .but that they intend to preserve this historical property for their families and future generations.")

Because the text of Public Law 30-158 fails to declare, in any of its terms, that the transfer of land to the selected individuals serves the public welfare, Public Law 30-158 is not entitled to

the statutory presumption that its effected taking is for a "public use" under 21 GCA § 15103. For this same reason, Public Law 30-158 is not entitled to a judicial presumption of public purpose under any constitutional analysis. Further, Public Law 30-158 was unaccompanied by any research regarding the impact of the takings, or any research as to whether its goal serves a public need. Finally, the law contains no procedural safeguards to ensure that the law will effect its intended public purpose, if, in fact, one exists. For these reasons, under any of the opinions expressed in Kelo, Public Law 30-158 is not entitled to a judicial presumption of public purpose under a constitutional analysis, and may be subject to heightened scrutiny at trial. Kelo, 545 U.S. at 493 (Kennedy, J., concurring)(heightened scrutiny and/or the possible presumption of invalidity should be applied to takings which are not effected for economic development, and/or are unaccompanied by other safeguards to ensure public purpose, and/or appear to present the acute risk of "impermissible favoritism").

Having concluded that Public Law 30-158 is not entitled to the presumption that its purpose serves the public, the Court will examine its provisions as a whole, to determine whether there is a legislatively proposed or conceived public purpose. Very few takings have ever failed to satisfy the "public purpose" standard. "As a result, the examples suggested in the reported cases tend to be highly implausible hypotheticals." Montgomery, 226 F.3d at 766 (citing to Gamble, 5 F.3d at 286 (using the example of a fictional state law authorizing the governor to take a person's home and give it to his brother-in-law)).

Consequently, there are few instances in which courts have invalidated takings under the Public Use Clause. In general, in those takings which have been found invalid, the legislating body has failed to present a real public purpose for the condemnation. See, e.g., Cincinnati v. Vester, 281

U.S. 439, 447–48 (1930) (taking invalid under state eminent domain statute for lack of a legislatively stated and explained public purpose); 99 Cents Only Stores v. Lancaster Redevelopment Agency, 237 F.Supp.2d at 1129 ("Indeed, [the city] itself admits that the only reason it enacted the Resolutions of Necessity was to satisfy the private expansion demands of Costco. . . .In short, the very reason that [the city] decided to condemn 99 Cents' leasehold interest was to appease Costco. Such conduct amounts to an unconstitutional taking for purely private purposes."); Brannen v. Bulloch County, 193 Ga.App. 151, 387 S.E.2d 395, 398–99(Ga. Ct. App. 1989)(invalidating county's exercise of eminent domain because "the 'real reason,' for its taking was to benefit the lumber company, either by returning to the mill the property dividing its operations or to avoid inconveniencing the mill by implementing the steps necessary to remove the hazardous condition to the public caused by the mill.")(internal citation omitted); Brest v. Jacksonville Expressway Authority, 194 So.2d 658, 660–61 (Fla. Ct. App. 1967)(petition to condemn dismissed and the declaration of taking quashed for lack of public purpose where reason for taking was "the fact that it would be much cheaper for the expropriating authority to condemn the defendant's property, and relocate the private railroad on the property so acquired."); State Highway Commission v. Batts, 144 S.E.2d 126, 136 (Sup. Ct. N.C. 1965) (state's taking invalidated for failure to declare and prove any public purpose, finding, "on August 1, 1963, the State Highway Commission duly passed a resolution placing said proposed Secondary Road 1768 upon the North Carolina Secondary Roads System.' The State Highway Commission's *resolution does not state it was for a public use*," "The State Highway Commission's declaration of taking and all the evidence in the record clearly show that the construction . . .would be for the substantial and dominant use and benefit of Mr. and Mrs. W. M. Batts and a few of their relatives; and that

any use by, or any benefit for, the general public will be only incidental and purely conjectural; that it is not for a public use, and that no public necessity, convenience, or utility exists for the State Highway Commission to condemn defendants' and Lovie Anne Joyner's land,")(emphasis added); *accord* Montgomery 226 F.3d at 766 (county's designation of a private driveway as a county road in order to allow its use by one other private person would most likely violate the Public Use Clause on remand). Finally, in Missouri Pacific R. Co. v. Nebraska, 164 U.S. 403 (1896), where the "order in question was not, and was not claimed to be, . . .a taking of private property for a public use" id. at 416, the United States Supreme Court invalidated a compensated taking of property for lack of a justifying public purpose. Briefly stated, takings which lack a clearly discernible public purpose, and which are effected solely to appease private parties have not withstood judicial scrutiny.

This case presents the Court with a "rare real-life example" of a taking with the primary legislatively stated purpose of granting private property to other private owners for their exclusive use and enjoyment. Montgomery, 226 F.3d at 766. Under 21 GCA § 15103, 162.40 Square Meters of Land, and Kelo, the Court cannot presume, in the absence of specific direction from the legislature, that the purpose of Public Law 30-158 is to benefit the public. There is no specifically pronounced public purpose in the law, but more importantly, the language of its provisions also does not appear to imply a public purpose, as the legislation openly declares its intent to transfer Lot Andersen South and Lot Naval Radio Station to 37 selected individuals, in order to satisfy only those particular individuals. Public Law 30-158, p. 2, lines 12–13.

Perhaps most notably, Public Law 30-158 not only declares an intent to take private property to give such property to other individuals, but further declares an intent to prevent any

further use of the property by the public. Public Law 30-158, p. 2, lines 12–16. In Montgomery, one of the few cases in which an alleged public purpose violation has been found plausible, in contending that a private taking had not occurred, the county appellees argued that "the only conceivable way Carter County could attempt a 'private' taking would be to condemn Queen Nave Road for . . .Hassell's exclusive use and then somehow use the county's authority to exclude others from using the road." Id. at 771. This quote precisely parallels the stated intent of Public Law 30-158, when read in its entirety. The law has condemned Lot Naval Radio Station and Lot Andersen South, and the Plaintiffs' interest in those lots, in order to grant the exclusive use of those lots to the 37 selected individuals. The law has further asserted the government's authority to exclude others from using or purchasing the lots. Public Law 30-158, §§ 6, 7 and 8. The law actually attempts to prevent any future transfers of the lots to others, and asserts a governmental right to purchase the transferred lots, exclusive of a sale to any other party. Public Law 30-158, §§ 7 and 8. Without addressing possible issues regarding restraints on the alienation of the property, see 21 GCA §§ 1254 and 1265, the language of this law declares a private taking, exactly as described by the appellees in the Montgomery case.

In Kelo, even under the United States Supreme Court's most broad interpretation of the deference to be granted to legislative acts, the plurality opinion affirmed that the governmental transfer of private property from person A to person B, unaccompanied by a unified development goal or eventual public plan for the property, would constitute an extreme and highly suspect taking, which would require judicial scrutiny: "a one-to-one transfer of property, executed outside the confines of an integrated development plan, is not presented in this case. While such an unusual exercise of government power would certainly raise a suspicion that a private purpose was

afoot, the hypothetical cases posited by petitioners can be confronted if and when they arise." Kelo, 545 U.S. at 487–88. Justice Kennedy agreed with this proposition, stating, "there may be categories of cases in which the transfers are so suspicious, or the procedures employed so prone to abuse, or the purported benefits are so trivial or implausible, that courts should presume an impermissible private purpose . . ." Id. at 493 (Kennedy, J., concurring).

The effect and means of Public Law 30-158 bear a striking resemblance to the improper taking suggested by both the plurality and the concurrence in Kelo. The taking proposed by Public Law 30-158 is not supported by any stated public plan for the property taken, and lacks any declaration of a benefit which will inure to the public or the community, if and when titles to Lot Andersen South and Lot Naval Radio Station are transferred to the 37 named and selected individuals for their exclusive use. On its face, Public Law 30-158 represents the extreme hypothetical taking envisioned by other courts, where the government takes from one set of private persons for the sole purpose of giving that property to another set of private persons "to receive these lands and to retain these lands for their families . . . ." Public Law 30-158 § 1, lines 16–17.

In order to be presumptively valid, 21 GCA § 15103, 162.40 Square Meters of Land, and Kelo require that a law must declare, in certain, definite terms, that its purpose in effecting a taking is a public benefit or goal. Public Law 30-158 does not meet this standard, and is not entitled to a presumption of validity. But, the analysis of the law's purpose does not end here, because the statement of intent of Public Law 30-158 takes one step further, and affirmatively asserts that its purpose is to benefit a few private individuals, thus removing the law's taking from the generally accepted realm of valid takings. Astonishingly, the analysis again does not end, as Public Law 20-158 takes a leap and a bound away from the public purpose domain, specifically stating that its

additional purpose is to keep the property taken out of the hands of the public. In light of these stated intentions, and the marked absence of a legislatively found public use within its provisions, Public Law 30-158 does appear to effect a purely private taking, which would violate the Public Use Clause of the Fifth Amendment, and which further provides no compensation to the DALB, thus, also appearing to violate the Just Compensation Clause of the Fifth Amendment.

Injunctive relief is available as a remedy to prevent an unconstitutional taking, if such taking purportedly violates the Public Use Clause. The Plaintiffs have alleged an illegal taking effected by Public Law 30-158, which has no legislatively declared "public purpose," under the analysis prompted by Monsanto and 7 GCA § 20302. Consequently, the issue is "ripe" for adjudication and the Plaintiffs will have standing to request such relief in this case.

### 2) Availability of Relief Under 7 GCA § 11311.1

Defendants also alternatively claim that the Plaintiffs cannot seek injunctive relief in this case because they will be entitled to seek relief under 7 GCA § 11311.1, and thus, are required to await a taking and then pursue such remedy, under the holding of Monsanto. The Court finds this argument unpersuasive based on the following analysis. The Plaintiffs generally claim that the taking which will be effected by Public Law 30-158 is illegal and unconstitutional, but the Plaintiffs also specifically claim that Public Law 30-158 fails to provide the Plaintiffs with any compensation for the taking, thus violating the Just Compensation Clause of the Fifth Amendment.

Under Monsanto and other controlling cases, takings claims which allegedly violate the Just Compensation Clause do not usually ripen or become justiciable until: (1) there has been an actual taking or a final decision regarding a use; and (2) the property owner has attempted to obtain compensation through appropriate legislatively provided inverse condemnation procedures. *See*

Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City, 473 U.S. 172, 186–95, & n. 14 (1985). However, "[t]his latter requirement applies only if a 'reasonable, certain and adequate provision for obtaining compensation' exists" in that jurisdiction. Montgomery, 226 F.3d, at 765 (quoting Williamson, 473 U.S. at 194).

The plain language of section 11311.1 of Title 7, Guam Code Annotated, specifically provides the remedy for those persons in Guam who have had real property taken from them, and not those persons who have had personal property taken from them. 7 GCA § 11311.1 allows a *landowner* to institute an action for inverse condemnation when the government of Guam has effected a taking of *land* and has provided no compensation to the landowner, and states in full:

> § 11311.1. Inverse condemnation. Any person whose *land* was expropriated for public purposes by the government of Guam between August 1, 1950, and July 1, 1994, and who has not been compensated by the government of Guam for such taking may institute an action for inverse condemnation. In any taking by the government of Guam after July 1, 1994, in which the government fails to follow the eminent domain provisions of Title 21, Guam Code Annotated, the person whose *land* is taken shall have four (4) years from the time of such taking to institute an action for inverse condemnation. An action shall lie for the taking of a person's fee or for lesser compensable interest in the property which has been expropriated by the government of Guam without according the person due process. In any action for inverse condemnation in which an award is made to a person for a taking, the court shall also award reasonable attorney's fees and costs.

7 GCA § 11311.1 (2011)(emphases added).

The Supreme Court of Guam has discerned that Public Law 22-73, and its subsequent amendments are controlling in all inverse condemnation cases brought under this statute. Cepeda v. Government of Guam, 2005 Guam 11 ¶¶ 12–17. In particular, the Guam's highest court has recognized that Section 5 of Public Law 22-73 governs the compensation that may be afforded to "landowners" who successfully prosecute an inverse condemnation case. Id. at ¶ 12, n. 3. On

March 3, 1994, Section 5 of Public Law 22-73 (Bill No. 318) was amended by Public Law 22-80:6 and currently provides:

> Alternative compensation. The Governor is authorized to offer to *an affected landowner* any (1) of the following or combination thereof: (a) direct compensation at either fair market value *of the land* when taken or its current fair market value, as *the landowner* prefers; (b) *area-for-area* exchange; or (c) credit toward territorial income taxes due or to become due.

Guam Pub.L. 22-80 § 6 (March 3, 1994)(emphases added).

The legislature is entitled to dictate the remedies allowable for inverse condemnation actions. Blanchette v. Connecticut General Ins. Corporations, 419 U.S. 102, 151, n. 39 (1974). Therefore, if the inverse condemnation statute is applicable, the Plaintiffs are limited to the remedies provided under this law, regarding compensation. Williamson, 473 U.S. at 194–95, & n. 14. Where an action lies for inverse condemnation of land under 7 GCA § 11311.1, Section 5 of P.L. 22-73, as amended by P.L 22-80 provides the applicable remedy.

In interpreting the entirety of Public Law 22-73 and its subsequent amendments, the Supreme Court of Guam has held that a plain language interpretation coupled with reference to the legislative findings of Public Law 22-73 is the proper method to determine the meaning of its provisions. Cepeda v. Government of Guam, 2005 Guam 11 ¶ 16 (citing Bank of Guam v. Guam Banking Bd., 2003 Guam 9 ¶ 19 (quoting Pangelinan v. Gutierrez, 2000 Guam 11 ¶ 23) ("In cases involving statutory construction, the plain language of a statute must be the starting point.")).

Thus, the Court must examine whether Public Law 22-73 and its subsequent amendments was intended to be a complete and all-encompassing scheme to provide compensation for any governmental takings, including land and personal property; or whether the intent was only to address land takings. After an analysis of the plain language of the law and its underlying

legislative findings, the Court concludes that Public Law 22-80:6 was intended to provide a comprehensive compensation plan for takings and inverse condemnation cases concerning land/real property, but not personal property.

Section 1 of the Legislative Intent of Public Law 22-73 states in part:

[S]ince 1945, it has also been the practice of the government to take private property without any compensation or compensatory exchange when that *land* has been needed for such purposes as public roads, access to property, or easements for public utilities, the construction of public schools, the construction of water wells, and similar projects benefitting the public at large. This practice must cease immediately because it is contrary to the principles of eminent domain, justice and constitutional guarantees of property rights.

Guam Pub.L. 22-73 § 1 (Feb. 16, 1994) (emphasis added).

Under Section 2 of this law, the Governor was tasked to compile research only on "lands" taken after 1945 for public use, in order to enable the government to compensate those landowners whose lands had been taken for public use purposes, stating:

The Governor shall immediately research and compile an exhaustive list of all private property which has been taken by the various agencies and departments of the government of Guam since 1945 . . . .*Lands* so taken shall include but not be limited to eminent domain, to condemnation, to outright taking, to all government easements (for any reason), and to all similar means of taking. . . . In the process of compiling this report, the records of the Department of Land Management, the Department of Public Works, the Guam Power Authority, the Public Utility Agency of Guam, the Guam Telephone Authority, the Guam Airport Authority, the Department of Agriculture, and all other agencies which from time to time are involved in *landtakings* or in the acquisition of easements, shall be thoroughly and completely researched and examined.

Guam Pub.L. 22-73 § 2 (Feb. 16, 1994)(emphases added).

In enacting this law, it is clear that the legislature concerned itself only with takings of real property from affected owners. The plain language of the law and legislative notes consistently and repeatedly refers to "land(s)," "landowners," "landtakings," and public uses which require

Page 71 of 79

occupation of real property, such as "easements," "roads," and "public utilities." 7 GCA § 11311.1; Guam Pub.L. 22-73 §§ 1–5; and Guam Pub.L. 22-80 § 6.

Specifically, under Section 4 of this law, "[t]hose private property owners whose *land* has been taken for utility easements shall have compensation paid from the funds of the agency which acquired the property rights." Guam Pub.L. 22-73 § 4 (Feb. 16, 1994)(emphasis added). This section and the following section do not contain a provision for reimbursement of those persons whose personal property has been appropriated by the government. Under this law, compensation is plainly limited to those persons who have had real property taken by the government.

There is no language within 7 GCA §11311.1, its amendments, or its accompanying legislative history to indicate that the statute provides a remedy for takings and inverse condemnation of personal property. To the contrary, the statute itself and the accompanying legislative sections make it clear that the Guam Legislature specifically intended this act to comprehensively cover compensation of any and all "landtakings," rather than personal property takings. Id. The United States Supreme Court has recognized that legislating bodies are entitled to dictate the form and manner of compensation for inverse condemnation cases. Blanchette v. Connecticut General Ins. Corporations, 419 U.S. 102, 150–1, n. 39 (1974). Accordingly, the Guam Legislature has seen fit to provide a statutory remedy for inverse condemnation proceedings, but only those proceedings which relate to takings of real property. It is apparent that there is currently no legislatively created remedy for takings of personal property under Guam law.

In this case, the affected parties do not claim that they own land, or the interest and rights to any land, which has been taken by the Government under P.L. 30-158, rather, they claim that they own the right to a stream of income generated by these parcels of land, as assets of the Land

Bank Trust. Moreover, it is undisputed by the Defendants that the Plaintiffs do not hold title to the land parcels in question. These land parcels were never distributed to them, nor titles or deeds to the land given to them. Thus, the Plaintiffs are not being deprived of the land itself, as contemplated under 7 GCA § 11311.1. Instead, the Plaintiffs are being deprived of income generating assets which are held, not by the Plaintiffs, but by a governmental fiduciary, in trust for the Plaintiffs, and the Plaintiffs allege that they will lose the resulting income from those parcels of land which will be removed from the Land Trust and granted to private individuals.

The Plaintiffs are not "landowners." They are the beneficiaries of a trust which holds the land for them. The Plaintiffs do not hold the titles to the parcels of land, the trust holds the titles to the parcels of land for their benefit. As previously discussed by the Court, takings may be of real and personal property, and although the subject of Public Law 30-158 is a transfer of land, Lot Naval Radio Station and Lot Andersen South, it is undisputed that the Plaintiffs will not be deprived of "land," but rather, the stream of income generated by the land as assets of the Land Trust, held and managed for their benefit. Both the assets of the trust (i.e., the income/interest producing parcels of land) and the resulting income from the assets of the trust will be taken by the government and given to the 37 selected individuals. This removal constitutes a taking of a private personal property interest. Accordingly, 7 GCA § 11311.1 does not provide a "reasonable, certain and adequate" statutory remedy under which the Plaintiffs may seek compensation. Williamson, 473 U.S. at 194.

Public Law 30-158 appears to effect a taking, which is improper and unconstitutional for lack of a stated or implied public purpose. The taking from the Plaintiffs is of personal property, rather than real property, and therefore, the inverse condemnation statute provides no remedy for

Page 73 of 79

the Plaintiffs. Under these circumstances, neither <u>Monsanto</u> nor <u>Williamson</u> prohibits a grant of injunctive relief, and accordingly, the Plaintiffs' claims are ripe, and they are lawfully entitled to seek a preliminary injunction.

**3)** **Plaintiffs Are Entitled to a Preliminary Injunction: Findings of Fact and Conclusions of Law Pursuant to Rule 52(a)**

"[W]here the [court] decides to grant the preliminary injunction, the appropriate procedure is not simply to continue in effect the temporary restraining order, but rather to issue a preliminary injunction, accompanied by the necessary findings of fact and conclusions of law." <u>Granny Goose Foods, Inc.</u>, 415 U.S. at 443.

GRCP Rule 52(a) provides that "in granting or refusing interlocutory injunctions the court shall . . . set forth the findings of fact and conclusions of law which constitute the grounds of its action." GRCP Rule 52(a) (2011).

To prevail on the preliminary injunction, Plaintiffs must show: 1) irreparable harm; and 2) likelihood of success on merits. The Court hereby sets forth the specific reasons that the Plaintiffs have shown they will suffer harm, and that they will likely succeed on the merits.

The Plaintiffs have demonstrated that Public Law 30-158 is most likely illegal and unconstitutional, as the Court finds that it does not facially meet the Fifth Amendment's requirement of a stated public purpose. In addition, the Plaintiffs have demonstrated that they are entitled to an injunction on a statutory basis: although 7 GCA § 20302 states that a permanent injunction cannot be granted to "prevent the execution of a public law by officers of the law for the public benefit," Public Law 30-158 does not contain a declared or implied public benefit. Accordingly, under the Fifth Amendment analysis and 7 GCA § 20302, an injunction arising from

a trust obligation may be granted in this case. Moreover, under the preliminary injunctive relief standards set forth by <u>Hongkong and Shanghai Banking Corp., Ltd., v. Kallingal</u>, 2005 Guam 13 ¶ 18, and an analysis of the factors which will prevent a party from seeking injunctive relief in a takings case, as set forth in <u>Monsanto,</u> it is apparent that the Plaintiffs will not be able to obtain compensation for the specific taking of property effected by Public Law 30-158, thus showing irreparable harm and a likelihood of success on the merits.

In finding that the Plaintiffs have shown standing to request injunctive relief, and have met the initial requirements to obtain a preliminary injunction, the Court is not making a final judgment as to the merits of the case—this order is, as it says, preliminary, operating only to maintain the status quo until a trial on the merits of this case. In order for the Court to eventually grant a permanent injunction, the Plaintiffs will be required to allege that Public Law 30-158 does not inure to the public benefit, and does not have a public purpose. As written, Plaintiffs' Complaint merely alleges general illegality, unconstitutionality, and inorganicity. It appears that Plaintiffs' Application is devoid of particular factual allegations regarding the Public Use Clause of the Fifth Amendment.

Further, in reaching the conclusion that the Plaintiffs are entitled to a preliminary injunction, the Court specifically does not find that Public Law 30-158 actually effects a taking for no "public purpose." Such a finding would constitute a merit determination. Rather, the Court finds that the provisions of the law contain no stated "public purpose," and therefore, on the face of the law's provisions, the Plaintiffs may pursue a suit for injunctive relief and declaratory relief concerning the constitutionality and statutory propriety of Public Law 30-158.

**CONCLUSION**

After hearing arguments, considering all of the filings presented, and contemplating the procedural posture of this case, the Court finds that the Defendants have unsuitably delayed this case by challenging the issuance of a TRO and application for a Preliminary Injunction through a Motion to Dismiss made pursuant to GRCP Rule 12. Applying the Guam Rules of Civil Procedure applicable to injunctive relief, the Court finds that under Rule 65(a), the parties received notice and a hearing at which they were allowed to advance any and all arguments concerning the merits of the application for a preliminary injunction, and thus, the Court may determine whether a preliminary injunction should issue. The Court further finds that the Plaintiffs have alleged a basis upon which the Court may grant preliminary injunctive relief, as the Plaintiffs have shown that Public Law 30-158, in all likelihood, effects a taking of their personal property. Further, this taking has not been declared for a public purpose, or the future implementation of a public purpose, and it appears that the Plaintiffs have no means of obtaining compensation prior to or subsequent to a taking of their personal property. Based upon the foregoing, the Court finds: 1) that Public Law 30-158 does not provide a stated public benefit, and therefore, the Plaintiffs have standing to request injunctive relief, and an injunction may properly issue to enjoin the execution of the law, consistent with the Public Use Clause and 7 GCA §§ 20301–2; 2) that the Plaintiffs will likely suffer irreparable harm if Public Law 30-158 is not preliminarily enjoined from execution, as provided by Rule 65(a) and the standard of <u>Hongkong and Shanghai Banking Corp., Ltd., v. Kallingal</u>, 2005 Guam 13 ¶ 18; and 3) that the Plaintiffs would have a likelihood of success on the merits of a constitutional challenge to Public Law 30-158, at trial in the matter, under the aforementioned standards. Further, pursuant to GRCP Rule 65( c), the Court finds that no security is required from the Plaintiffs, as the Court finds that the Government of Guam and the Guam

Ancestral Lands Commission are not likely to suffer any costs or damages during the pendency of this action, in the event that the Court later finds, at trial, that these entities were wrongfully enjoined from transferring lands pursuant to Public Law 30-158.

WHEREBY, IT IS ORDERED:

That each of the Commissioners of the Guam Ancestral Lands Commission is hereby restrained and enjoined from transferring Lot Naval Radio Station ( R) Finegayan-1 (formerly Federal Aviation Administration (FAA) site, also referred to as "Parcel N2," consisting of ±2,758,882 square meters, or ±581.732 acres, and Lot Andersen South, also known as Marbo Base Command "C," or Andersen South, consisting of approximately ±1,598,877 square meters, or ±395.09 acres of land, as set forth and required by Public Law 30-158. This injunction shall remain in effect until the Court finally disposes of this case, after trial in this matter.

As there is a contemplated motion to intervene, which has been presented to the Court, but has not yet been properly filed by proposed interveners, the Court will decide any issues pertaining to intervention prior to trial in the matter. The Court takes this opportunity to urge speed in properly filing any motion to intervene, or to encourage the moving party to abandon the pursuit of a hearing for oral argument, in order to facilitate compliance with the rules and expedite the determination of this case. Further delay may be found inexcusable. After determination of intervention, the Court will set a separate date for trial of the matter to decide whether a permanent injunction shall issue, at which time the parties will have the opportunity to present all arguments and evidence necessary for the Court to determine the Plaintiffs' success on the merits of the application, and enter final judgment in the case. GRCP Rule 65(a)(2); Golden Gate Hotel Ass'n v. City and County of San Francisco, 18 F.3d 1482, 1483 (9th Cir. 1994); and Sierra On-Line, Inc.

v. Phoenix Software, Inc., 739 F.2d 1415, 1422 (9th Cir. 1984)("A preliminary injunction, of course, is not a preliminary adjudication on the merits but rather a device for preserving the status quo and preventing the irreparable loss of rights before judgment.").

Finally, in the Complaint filed, the Plaintiffs have affirmatively alleged that Plaintiffs intend to amend their Complaint to fully set forth the alleged class and issues to be presented at trial. Gange et. al. v. Government of Guam et. al., Civil Action CV1461-10, Class Action Compl. for Injunctive Relief, for Declaratory Relief, and Alternatively for Just Compensation, p. 2, ¶ 4; pp. 6–7, ¶ 24 (filed August 25, 2010). Although the Court was required to analyze whether Public Law 30-158 sets forth a viable "public use" for the purposes of determining whether the Plaintiffs would have standing to request injunctive relief under the factors set forth in Monsanto and 7 GCA § 20302, it is not apparent from the factual allegations of the Complaint that the Plaintiffs have specifically set forth a cause of action challenging Public Law 30-158 on the basis that it violates the Public Use Clause of the Fifth Amendment. The Plaintiffs merely state that "Public Law 30-158 is unconstitutional, inorganic, and illegal . . ." Id. at p. 8, ¶ 35. This statement is sufficient to sustain the grant of a preliminary injunction, however, it is not clear that this is a particularly stated "public use" claim under the Fifth Amendment, upon which the Plaintiffs could prevail at trial, thus meriting the grant of a permanent injunction or declaratory relief. Moreover, because the Plaintiffs merely claim that Public Law 30-158 is unconstitutional, inorganic, and illegal, without particular reference to specific laws and subsections, it is unspecified whether the Plaintiffs are challenging the public law and requesting an injunction on substantive due process grounds, procedural due process grounds for lack of a pre-deprivation hearing, claims pursuant to 42 U.S.C. § 1983, or whether they have presented a challenge under 48 U.S.C. § 1421(b)(u), or any

of the other laws of Guam.

As previously noted by the Court, Defendants' professed Motion to Dismiss failed to challenge Plaintiffs' Complaint for the failure to distinctly set forth a cause of action, instead attacking the Plaintiffs' standing or ability to apply for injunctive relief. At this time, the statement that Public Law is unconstitutional, inorganic, and illegal is sufficient for the grant of a preliminary injunction, however, at trial, Plaintiffs will be required to prove the elements of each specifically stated cause of action by a preponderance of the evidence, and the Court will not read causes of action into the complaint which are not clearly and succinctly set forth. Taitano v. Calvo Finance Corp., 2008 Guam 12, ¶ 11 (citing Krouse v. Am. Sterilizer Co., 126 F.3d 494, 499 n. 1 (3d Cir.1997)("this court will not read causes of action into a complaint when they are not present.")). To the stated intention of the Plaintiffs to amend their Complaint, the Plaintiffs are GRANTED LEAVE TO AMEND the Complaint within thirty days of the date of this decision. If amendment occurs, Defendants will be afforded the opportunity to file a new motion to dismiss on proper grounds, in accordance with GRCP Rule 12 and CVR Rule 7.1. If a new complaint is filed, the proposed interveners will be allowed an opportunity to file a motion to intervene in accordance with CVR Rule 7.1. Once any issues regarding intervention are determined, the Court will afterward hear the Plaintiffs' already filed Motion to Certify Class and determine any issues regarding the sufficiency of the Complaint.

SO ORDERED, this JAN 2 3 2012 _____.

I do hereby certify that the foregoing is a full, true, and correct copy of the original on file in the office of the Clerk of the Superior Court of Guam

JAN 2 3 2012

Joleen C. Camacho
Deputy Clerk, Superior Court of Guam

**HONORABLE ARTHUR R. BARCINAS**
Judge, Superior Court of Guam

Page 79 of 79